Daniel J. Wadley (10358)
wadleyd@sec.gov
Amy J. Oliver (8785)
olivera@sec.gov
Alison Okinaka (7954)
okinakaa@sec.gov
Cheryl M. Mori (8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple Street, Suite 1800
Salt Lake City, Utah 84101
Tel.  801-524-5796

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          PLAINTIFF,<br><br>v.<br><br>TRAFFIC MONSOON, LLC, a Utah Limited Liability Company and CHARLES D. SCOVILLE, an individual,<br><br>          DEFENDANTS. | **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING THE SECURITIES & EXCHANGE COMMISSION'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING CHARLES D. SCOVILLE'S MOTION TO SET ASIDE RECEIVERSHIP**<br><br>Case No.: 2:16-cv-00832-JNP<br><br>Judge Jill N. Parrish |

Plaintiff Securities and Exchange Commission (the "Commission"), by and through

counsel of record, submits these Proposed Findings of Fact and Conclusions of Law Granting the

Securities & Exchange Commission's Motion for Preliminary Injunction and Denying Charles

D. Scoville's Motion to Set Aside Receivership.

## PROCEDURAL HISTORY

On July 26, 2016, the Commission filed a Complaint (Docket No. 2) alleging that Charles D. Scoville ("Scoville") and Traffic Monsoon, LLC ("Traffic Monsoon") (together "Defendants") had violated Sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and (c) and 77q(a)(1) and (3), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) thereunder, 17C.F.R. §240.10b-5(a) and (c).   On that same date, the Commission also submitted its *Ex Parte* Motion for Temporary Restraining Order, Order Appointing Receiver, Freezing Assets and Other Ancillary Relief and Memorandum in Support ("TRO Motion") (Docket No. 3), requesting, among other things, that Scoville and Traffic Monsoon be temporarily and preliminarily restrained from conduct in violation of the federal securities laws. The Court granted the Commission's Motion, issuing a Temporary Restraining Order and Order Freezing Assets ("TRO") (Doc. No. 8) and an Order Appointing Receiver ("Receivership Order") (Doc. No. 11).   Both Traffic Monsoon, through counsel for the Receiver, and Scoville, through his then-counsel of record, were served with the Complaint.  (Doc. Nos. 22 and 23).

On September 23, 2016, Scoville submitted his Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. No. 32) and also a Motion to Set Aside Receivership (Doc. No. 33). Subsequent briefing was submitted on these two issues (Doc. Nos. 38, 39, 45, 48, 49, and 53).  A two-day evidentiary hearing was held on November 1 and 3, 2016.

Section 20(b) of the Securities Act, 15 U.S.C. §77t(b), and Section 21(d) of the Securities Exchange Act, 15 U.S.C. §78u(d), vests the Court with the authority to temporarily and permanently enjoin a defendant from future violations of the federal securities laws upon a

2

showing that the defendant has engaged in or is about to engage in acts or practices constituting a violation of the federal securities laws. To obtain preliminary injunctive relief in the course of a civil proceeding, the Commission bears the burden of demonstrating a *prima facie* case of previous violations by the defendant and a reasonable likelihood that the wrong will be repeated.

The Court has considered the briefing submitted by all parties, the testimony of witnesses presented in the evidentiary hearing, received into evidence multiple exhibits, and has considered oral argument offered by the parties hereto. Based on the evidence presented, the Court has concluded that the Commission has satisfied its burden and is entitled to the issuance of a preliminary injunction against Scoville and Traffic Monsoon. Accordingly, the Court orders that the Defendants are enjoined from violating the federal securities laws during the pendency of this litigation. In connection with this conclusion and Order, the Court denies Scoville's Motion to Set Aside Receivership. The Receivership Order, including the asset freeze, remains in full force and effect.

## FINDINGS OF FACT

**A.     Traffic Monsoon was Organized in Utah in September 2014 and Utilized Scoville's Murray, Utah Apartment as the Company's Headquarters.**

1.     On September 29, 2014, Scoville registered Traffic Monsoon with the State of Utah as a domestic limited liability company. *See* Hearing Transcript ("Tr."), pp. 29-32; Ex. 1, Declaration of Receiver Peggy Hunt (Business Operations) ("Hunt Dec. Business"), ¶¶ 6-7. Organizational documents filed with the State of Utah identify Scoville as Traffic Monsoon's sole member/manager and Registered Agent, and lists his Murray, Utah, apartment as Traffic Monsoon's corporate address. *Id.*

2.      Traffic Monsoon was operated by Scoville through a website with the address www.trafficmonsoon.com ("the Website").  Tr. p. 12, Hunt Dec. Business, ¶. 8.  The Website identified Scoville's Murray, Utah apartment as the corporate office.  Tr. pp. 33-34; Hunt Dec. Business, ¶ 8.

3.      Scoville is a Utah resident and has consistently filed both federal and Utah state tax returns (including tax years 2014 and 2015) identifying his Murray, Utah, apartment as his residence.  Tr. pp. 49-50.  Although he apparently has a home in the U.K., he has traveled between Utah and the U.K. regularly over the past year and has been in the United States for some portion of each month over the preceding 12 months.  Tr. pp. 45-46.

4.      The Website also provided a secondary address in the United Kingdom for Traffic Monsoon Global Limited ("TM Global").  Tr. pp. 33-35; Hunt Dec. Business, ¶¶ 9-11.  The TM Global formation documents and the Website both identify its business address of 2 Heigman Road, East Ham, London, U.K.  *Id.*  Although Scoville was not the individual who organized TM Global, in February 2016 he filed an annual return in which he listed himself as the sole director and shareholder.  *Id.*  In this same annual return Scoville declares that he is a U.S. citizen who usually resides in the United States.  Tr. p. 35.

5.      Scoville paid 6,000 pounds per month for the Heigman Road office address associated with TM Global.  *Id.*  When asked about TM Global and the U.K. office address, Scoville stated that he set TM Global up after PayPal froze the Traffic Monsoon account and as a precondition to using another payment processor, Allied Wallet.  He stated the Heigman Road address was not someplace that customers could go, was not a location out of which Traffic Monsoon conducted business, and that, now, he believes he "may have been scammed" because

4

it does not appear that Traffic Monsoon had any actual presence at the Heigman Road location.

Tr. pp. 40-43; Hunt Dec. Business, ¶¶ 9-11.  The Receiver has been unable to find any

meaningful business operations being conducted through TM Global or out of the Heigman Road

office location in the U.K.  Tr. p. 43.

      6.     Traffic Monsoon did not have any employees besides Scoville.  Tr. p. 90.

      7.     Traffic Monsoon contracted with two individuals for call center services.  Tr. pp.

61-62.  One individual operated call centers in Florida and the Philippines, while the second

operated a call center in North Carolina.  *Id.*  He paid a combined $64,000 per month for the call

center services, which he described as exclusively providing "customer support."  Tr. p. 62.  No

sales were solicited through the call centers.  *Id.*

**B.**     **Traffic Monsoon Conducted its Business, Including the Sale of All of its Products
and the Processing of those Sales, Exclusively Through Servers Housed in the
United States.**

      8.     Traffic Monsoon leased between 10-11 servers from a North Carolina web-

hosting entity named Snoork.  Tr. pp. 51-52, 240-42.  All of the servers are located in the United

States – 10 in Atlanta and one in Los Angeles.  *Id.*  Scoville was the exclusive Administrator of

the Traffic Monsoon servers.  Tr. p. 90.

      9.     All business and transactions that were handled by Traffic Monsoon, including all

purchases by Traffic Monsoon members, all credits allocated to each member account, and all

funds that came in from members and that were paid out to members, were processed through

the servers leased from Snoork, irrespective of where the Traffic Monsoon members were

located.  Tr. pp. 51-52, 240-42.  As such, the transaction and the data underlying each transaction

was conducted and held in the United States.  Tr. p. 241.

10.     Traffic Monsoon did not maintain any accounting system separate from the website and information contained on the Snoork servers.  Tr. p. 244.

11.     With respect to the North Carolina web hosting company, "Snoork," that Traffic Monsoon used to process all Traffic Monsoon transactions and store all information on its locally-based servers, Scoville testified:

Q.     Was that Snoork –

A.     Yes, Snoork.

Q.     -- your web host?

A.     Uh-huh.

Q.     I had thought you used your programmer in Russia to do that.

A.     No, not that time.

Mr. Frost:     When you say you downloaded it to your own server, what is that?

The Witness:   Well, my hosting company, their method of sending it to me was they pulled it from their side and then put it on my server for me to be able to download.

Mr. Frost:     When you say your server, you mean – do you have a standalone computer server somewhere, or is it still your host?

The Witness:   The hosting company, what they offer is hosting.  So that's like file space.  But what I have are dedicated servers that no one else is sharing, just me. And so they put it onto one of my dedicated servers.

By Ms. Okinaka:

Q.     Those are servers at Snoork?

A.     Uh-huh.

Q.     Yes?

A.     That's right, yes.

                    *     *     *     *     *

Q.     Let me show you – oh, well, I just wanted to ask you briefly about Snoork again.

A.     Okay.

Q.     I know we talked about that when you came in before.  But it's your web host; is that right?

6

A.      That's right.  They're a hosting company.

Q.      And what data does it host?

A.      Everything with my website, yeah.

Q.      And does it also host any back office administrative data that you have?

A.      Well, what it is is when you have a server that contains everything.  So when I log in to my site, I am accessing a – the information that's in the database is in their servers.

Q.      Uh-huh.  So do you have – you have an admin panel, don't you?

A.      Yes, I do.

Q.      What do you see on there?

A.      When I log in, I can see all of the members; I can see what their balances are; I can look at their addresses, phone numbers, the information that they've entered.  Pretty much anything.  I can see everything except for certain things that I didn't think about having my programmer ask.  So that's when I just have him build something in if I need to have him pull records or whatever.

Q.      I think we talked about his before, too, but I think you said you don't keep financial statements as such for Traffic Monsoon.  Is that right?

A.      Like, what kind of statements.

Q.      Like a balance sheet and an income statement.

A.      It's all in the database, so it's all saved in that cash table.  So everything that's in–out, it's there.  And then the payments coming in for purchases of serve are on that pay-ins table.

Plaintiff's Ex. 4; Doc. No. 3, TRO Motion, Ex. A, Scoville Test., pp. 34-35, 84-86.

**C.      Traffic Monsoon's Primary Product, the AdPack, Generated Over 98% of the Entity's Revenue.**

12.      Traffic Monsoon purported to operate as a web traffic exchange that sold several different products, including but not limited to website visits and banner ad "clicks."  Tr. pp. 12-17.  Although it purported to sell several different products, the product that constituted over 98% of all Traffic Monsoon revenue was the revenue-sharing Banner AdPack ("AdPack").  Tr. p. 17, 274.

7

13.     The AdPack cost $50 and bundled 1,000 visits to the member's website and 20 clicks to the member's banner ad, each of which could be purchased separately for $5.95 and $5.00, respectively, for a total of $10.95.  Tr. pp. 17-18, 246-47.  The AdPack also allowed the member to share in the revenues of Traffic Monsoon, up to a maximum amount of $55.  *Id*., p. 19.  To "qualify" for this revenue sharing, the customer was obligated each day to click on 50 ads and remain on each ad for 5 seconds.  *Id.*  This took the member 4.1 minutes per day.  The member's obligation to click on 50 ads for 5 seconds per ad was a static obligation – it did not increase if the member purchased and owned additional AdPacks.  *Id.* p. 23.  Whether the member owned 1 or 1,000 AdPacks, he was only obligated to click on only 50 ads per day and remain on the ads for 5 seconds each.

14.     In addition to the revenue sharing component of the AdPack, Traffic Monsoon members also were entitled to a 10% commission on all AdPacks purchased by individuals they referred to Traffic Monsoon.  Tr. p. 301-02.

15.     Many individuals owned hundreds and thousands of AdPacks.  Tr. p. 23; Plaintiff's Exs. 11, 12.

16.     All revenue generated by Traffic Monsoon from the sale of AdPacks was pooled into a central account, first at PayPal and later at other payment processors, including Payza, Allied Wallet, and Solid Trust Pay, after PayPal froze the account.  Tr. pp. 25-27, 90-91.  Traffic Monsoon credited members their revenue sharing allocation into their Traffic Monsoon account. Tr. 246-48.  Members could either request a payout of their account balance or, more commonly, would use the balance to "purchase" additional AdPacks.  Tr. pp. 249-250.

17.     Traffic Monsoon member correspondence with the Receiver evidences that Traffic Monsoon customers' primary motivation in purchasing AdPacks was to earn the $5 return on each AdPack, not to receive the advertising services that were available for $39 cheaper if purchased separately from the AdPack.  Tr. pp. 74-76, 84-85.  Indeed, many members have not received and/or used the web visits and banner clicks purchased in the AdPack.  Tr. pp. 181-186.

18.     By Traffic Monsoon's own description, it has delivered only 1.6 billion website visits out of the 17.5 billion that have been purchased by Traffic Monsoon members.  Tr. pp. 82-84.  In other words, it has delivered only 10% of the web traffic purchased by members through the sale of AdPacks.  It would cost Traffic Monsoon tens of millions of dollars to acquire and deliver the billions of web visits it owes to its members.

**D.     Traffic Monsoon Relied on New Investor Funds to Pay Returns to Earlier Traffic Monsoon Investors.**

19.     Traffic Monsoon relied on the sale of new AdPacks to pay the $5 return to earlier AdPack purchases.  Tr. pp. 27, 249.

20.     Because Traffic Monsoon lost $5 on each transaction, meaning that it was paying $5 more to each AdPack purchaser than it was charging them for the sale of the AdPack, and because it had no material source of revenue other than the sale of AdPacks, it was structured and operated as Ponzi scheme that was not sustainable.  Tr. pp. 288, 297.

21.     Between October 2014 and July 2016, Traffic Monsoon members worldwide paid $173 million for 3.4 million AdPacks.  Tr. pp. 270-77, Plaintiff's Ex. 6.  Traffic Monsoon members purchased approximately 14 million additional AdPacks for $700 million during that same period by rolling over their revenue-sharing credit payments into the purchase of these new

9

AdPacks.  *Id.*  During that same period, Traffic Monsoon members paid approximately $2.9

million for all other Traffic Monsoon products combined.  *Id.*  AdPack sales constituted the only

material source of revenue for Traffic Monsoon.

22.     99% of AdPack buyers qualified for some portion of revenue sharing after their

purchase of an AdPack.  Tr. pp. 260-61; Plaintiff's Ex. 5.  The only material revenue source

available to pay investors was derived from the sale of new AdPacks.

23.     Out of the $175.9 million total paid into Traffic Monsoon by its members,

approximately $88.4 million has been paid back out to its members, leaving a difference of $87.4

million between what was paid in by members and what they have taken out.  Tr. pp. 278-81,

Plaintiff's Ex. 7.  This figure does not take into consideration potential "net winners," *i.e.*

individuals who took out more than they paid into Traffic Monsoon.  Tr. p. 282.

24.      The current combined account balance of Traffic Monsoon members is $34.2

million.  Tr. pp. 284-86; Plaintiff's Ex. 7.  If the outstanding AdPacks currently owned by Traffic

Monsoon members were allowed to mature, the account balance would swell by an additional

$243.9 million, for a combined balance of $278.1 million.  *Id.*  This amount does not take into

consideration the additional amounts that would be owed to new purchasers of AdPacks.

25.     The Receiver currently has between $50-$60 million in frozen Traffic Monsoon

assets.  Tr. p. 110.

26.     Scoville and Traffic Monsoon claimed on the Website that Traffic Monsoon was

not a Ponzi or Pyramid scheme, misleading investors as to the true nature of Traffic Monsoon's

structure.  Plaintiff's Ex. 1, Ex. 3 attached thereto.  Specifically, the Website stated:

> In conclusion, when looking at pure definitions, Traffic Monsoon is not a Ponzi and is
> not a pyramid scheme.  It's a business that sells advertising services, offers sales

commissions, and allows members to qualify to share in the sales revenues by actively viewing other member websites.

27.     The Receivership Assets are currently insufficient to repay all funds contributed by and owed to Traffic Monsoon investors.

## CONCLUSIONS OF LAW

1.     This Court has subject matter jurisdiction over this proceeding by authority of Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§77t(b), 77(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §78v(a), and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

3.     The Commission has made a sufficient and proper showing in support of the relief granted herein as required by Section 20(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u(d)] by evidence establishing a *prima facie* case of, and a strong likelihood that the Commission will prevail at trial on the merits and that Traffic Monsoon and Scoville, directly or indirectly, have engaged in and, unless restrained and enjoined by order of this Court, will continue to engage in, acts, practices, and courses of business constituting violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.     Sections 5(a) and (c) of the Securities Act provides, in pertinent part:

*(a) Sale or delivery after sale of unregistered securities.* Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

*(c) Necessity of filing registration statement.*

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

5.    Section 17(a) of the Securities Act provides, in pertinent part:

(a)  Use of Interstate Commerce or Purpose of Fraud or Deceit.  It shall be unlawful for any person in the offer or sale of any securities . . . by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly –

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

6.    Section 10(b) of the Exchange Act makes it unlawful to:

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

7.     Rule 10b-5 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

## I.     THE DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS.

8.     To sufficiently state a claim under Rule 10b-5(a) and (c), the Commission must allege that (1) the defendant committed a deceptive or manipulative act or conducted his business, (2) in furtherance of the alleged scheme to defraud, (3) with scienter.  *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 474 (S.D.N.Y. 2005).  *See also SEC v. Patel*, 2009 WL 3151143 at *8 (D.N.H. 2009) ("subsections (a) and (c) encompass much more than illegal trading activity: they encompass the use of *any* device, scheme or artifice, or *any* act, practice, or course of business used to perpetrate a fraud on investors.") (emphasis in original) (internal citations omitted); *In re Global Crossing Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 337 (S.D.N.Y. 2004) (finding sufficient allegations of fraud to support a case under Rule 10b-5(a) and (c)).

9.      The requirements to state a claim under Sections 17(a)(1) and (a)(3) of the Securities Act are similar in scope and effect as those under Rule 10b-5(a) and (c), except that there is no element of scienter in a Section 17(a)(3) claim.  *See SEC v. Wolfson*, 539 F.3d 1249, 1256-57 (10th Cir. 2008).

10.     Under these provisions, to obtain a preliminary injunction the Commission is required to make a *prima facie* showing that the Defendants (1) operated a scheme to defraud, or conducted a practice or course of business which operates as a fraud, (2) in connection with the offer, purchase, or sale of a security, (3) in interstate commerce or with the use of the mail, (4) with reckless intent (except as to Section 17(a)(3) which requires a showing of negligence).

**A.      The Defendants Operated a Scheme to Defraud, or Engaged in a Practice or Course of Business which Operated as a Fraud Upon Traffic Monsoon Members.**

11.     The facts establish that Scoville was engaged in a scheme to defraud in the offer or sale, or in connection with the purchase or sale of a security, in interstate commerce, with the intent to deceive.

**1.    AdPacks are Securities**

12.     Traffic Monsoon's $50 AdPack, with its profit-sharing component that paid investors a 10% return after 55 days, was a security under *Howey*.  Traffic Monsoon's sale of AdPacks to investors involved (1) an investment of money, (2) in a common enterprise, (3) with a profit derived from the efforts of others.  *Id.*  Neither Scoville's attempt to embed $11 worth of "advertising services" within the $50 investment, nor his requirement that investors click on other banner ads for 4 minutes per day irrespective of the number of AdPacks purchased, changed the nature of what he was selling – the opportunity to receive a return, based on the initial investment of money, that was to be drawn from the sales of Traffic Monsoon's products.

13.     Traffic Monsoon investors were investing money in a common enterprise by purchasing AdPacks.  In evaluating this element, Courts in the 10th Circuit consider the economic realities of the transaction, which constitutes the primary consideration in determining whether the funds were invested in a "common enterprise" under *Howey*.  *See McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985).

14.     The advertising services that Scoville bundled in the $50 AdPack were available for approximately $11 if purchased separately.  *See* Tr. p. 18; TRO Motion, pp. 15-16 and Exhibit B attached thereto, Declaration of Scott R. Frost ("Frost Decl."), ¶ 19.  There was nothing else in the AdPack product that the investor received from the purchase of the AdPack separate from the afore-mentioned services and the profit-sharing position.  The economic reality of the transaction is clear – Traffic Monsoon investors invested funds into a common enterprise that provided them with a 10% return after approximately 55 days.

15.     The third factor of the *Howey* test is also met because the Traffic Monsoon investors receive profits based on the efforts of others.  The efforts made by Traffic Monsoon and Scoville in the program were the "undeniably significant ones, those essential managerial efforts which affect the failure and success of the enterprise."  *See SEC v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476, 482 (9th Cir. 1973).  Scoville does not contest the fact that investors have no role in managing Traffic Monsoon and rely on Traffic Monsoon to operate the traffic exchange, collect revenue, supplement the revenue from its reserve fund, and distribute it to members.  Traffic Monsoon also sets up the banner ad rotator and tracks clicks by members seeking to qualify to share in profits.  These are the significant efforts needed to generate the returns, none of which are performed by individual investors.

16.     The fact that investors are required to contribute 4.1 minutes of time per day in clicking on 50 ads for 5 seconds per ad in order to qualify for profit-sharing does not take the AdPack outside the realm of securities.  Although investors were required to expend some efforts, i.e., recruit other investors, "the *sine qua non* of the scheme" or the efforts that kept the scheme going, were the efforts of the company in generating more business.  *Glenn Turner,* 474 F.2d at 483.  The investor's efforts in clicking 50 times, for 4.1 minutes per day, cannot be viewed as significant, especially since the investor only has to click on 50 banner ads per day regardless of how many AdPacks he owns – whether one or 1,000.  *See also United States v. Bowdoin,* 770 F. Supp. 2d 142, 151-52 (D.D.C. 2011).

17.     Because investors were investing money into Traffic Monsoon with the expectation of earning a return, Scoville was selling securities.

**2.   Scoville Acted with Scienter**

18.     Scoville operated an illegal Ponzi scheme and, as such, he is determined to have possessed the requisite level of scienter to sustain the Commissions Section 10(b) and 17(a) causes of action.

19.     More than 98% of Traffic Monsoon's revenue was derived from the sale of its profit-sharing AdPack.  Scoville does not contest that returns to individuals who purchase AdPacks are dependent upon new investors purchasing new AdPacks.  Indeed, he admits to as much in his Traffic Monsoon website videos, and again admits this fact in his Opposition.  *See* Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, p. 20.  As new investors purchased new or additional AdPacks, the profits were then distributed to earlier investors in the form of returns.

20.     The operation of a Ponzi scheme is an inherently fraudulent scheme and course of business, and as such violates these provisions whether or not the defendant is alleged to have made material misstatements in connection with its operation.  *See, e.g., SEC v. Management Solutions*, 2013 WL 4501088 at *7 (D. Utah Aug. 22, 2013) (unpublished) ("The general pattern courts look for when labeling a scheme as "Ponzi" is "any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.").

21.     Because Scoville and Traffic Monsoon are selling securities, and because they are paying returns to investors who purchased those securities that are financed solely through the sale of new securities, Traffic Monsoon is operating a classic Ponzi scheme.  And because Scoville was operating a Ponzi scheme, the "question of intent to defraud is not debatable." *Conroy v. Shott*, 363 F.2d 90, 92 (6th Cir. 1966); *see also In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 535 (9th Cir. 1990) ("debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme").

22.     By operating a Ponzi scheme, Scoville acted with scienter.  Based on the fact that Scoville operated a Ponzi scheme, together with the fact that he created, operated, and managed Traffic Monsoon exclusively as its sole member/manager, Scoville's scienter is established for purposes of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**B.   The Scheme was Undertaken through the Means and Instrumentalities of Interstate Commerce or by Use of the Mails and Constituted both Conduct Within the United States as well as Domestic Securities Transactions.**

23.     It is undisputed that the actions described above were undertaken in interstate commerce, through the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails.

24.     More specifically, Scoville and Traffic Monsoon made direct use of the internet by Traffic Monsoon soliciting new purchases, facilitating the transactions, and receiving and paying funds related to the transactions.

25.     The Court also concludes that the anti-fraud provisions of the federal securities laws apply to all of Traffic Monsoon's AdPack sales pursuant to Section 22(c) of the Securities Act of 1933 (15 U.S.C. §77v(c)) ("Securities Act") and Section 27(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78aa(b)) ("Exchange Act") which codify the "conduct and effects" test set forth in Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").

26.     The Court further concludes that Traffic Monsoon's conduct constitutes domestic transactions of securities, thus satisfying the standard for extraterritorial application of the anti-fraud provisions of the federal securities laws set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

27.     Pursuant to Section 22(c) of the Securities Act and Section 27(b) of the Exchange Act, this Court is empowered to hear and adjudicate the Commission's case against Scoville and Traffic Monsoon's transnational fraudulent scheme, in violation of the federal securities laws, because it involved:

18

(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or

(2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

§ 27(b) of the Exchange Act.  In this case, Scoville's and Traffic Monsoon's conduct in creating, marketing, selling, and managing the Traffic Monsoon investment scheme all occurred within the United States.

28.     In considering the "conduct test," courts have held that "jurisdiction exists only when substantial acts in furtherance of the fraud were committed within the United States, and that the test is met whenever (1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere and (2) the activities or culpable failures to act within the United States directly caused the claimed losses."  *SEC v. Berger*, 322 F.3d 187, 193 (2d Cir. 2003) (internal citations and quotations omitted).

29.     The evidence establishes that (1) Scoville was the sole owner and controlling person of Traffic Monsoon; (2) he ran the company by himself out of his Murray, Utah residence; (3) he has no employees and outsourced all company functions to, among others, a web hosting company in North Carolina that facilitated all transactions, including sales of AdPacks, with investors; (4) the servers that processed all Traffic Monsoon business, including all transactions between Traffic Monsoon and its members, were housed in the United States; and (4) Scoville contracted with three call centers, one of which was located in Florida and another in North Carolina.  *See* Tr. pp. 29-52, 61-62; Doc. No. 3, TRO Motion, p. 5, and Exhibit A attached thereto (5/17/2016 Testimony of Charles D. Scoville ("Scoville Test.") at pp. 35, 39-41.

19

30.   There is no evidence that Scoville or Traffic Monsoon conducted any of its business operations outside of the United States.

31.   Based on Scoville's testimony and the evidence offered at the hearing, it is clear that "the fraudulent scheme was masterminded and implemented by [Scoville] in the United States," *Berger*, 322 F.3d at 194, and that all material transactions were conducted through, and information was stored and housed on, computer servers that were provided by a web hosting company located in the United States.

32.   Accordingly, in light of these uncontroverted facts, Scoville's and Traffic Monsoon's operation of a Ponzi scheme included action "within the United States that constitute[d] significant steps in furtherance of the violation" of the securities laws.  As such, this Court has jurisdiction, and the federal securities laws therefore apply, to this conduct pursuant to Section 22(c) of the Securities Act and 27(b) of the Exchange Act.

33.   In addition, even if the domestic securities transaction test from *Morrison* applied instead of the conduct and effects test, the test is satisfied here.  *See Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  Because the transactions were facilitated exclusively through servers located in the United States, by a United States company, they were "domestic transactions" under *Morrison*.  *See Absolute Activist Value Master Fund Ltd.*, 677 F.3d 60, 68 (2d Cir. 2012).

34.   Under *Absolute Activist*, in order to allege a domestic transaction for purposes of establishing application of the federal securities laws, the Commission is obligated to "allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States; that is, that the purchaser incurred irrevocable liability within the United States to

20

take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.*

35.     Importantly, the location and residency of the purchaser is not relevant to the question of whether a domestic transaction has occurred.  "A purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States." *Id.* at 69.

36.     In this case, Traffic Monsoon's sale of AdPacks constituted domestic transactions. By Scoville's own admission, the sales were facilitated exclusively through servers housed in Atlanta and Los Angeles, by a U.S.-based company, operated by a United States citizen.  It was only when purchase orders or other directions were received and processed on the Traffic Monsoon servers that liability for those transactions arose.  As such, Traffic Monsoon "incurred irrevocable liability within the United States to deliver a security." *Absolute Activist*, p. 68. Therefore, by conducting the sales through its U.S.-based servers, Traffic Monsoon incurred irrevocable liability within the United States to deliver its securities to Traffic Monsoon investors, which subjects it to liability under *Morrison* and *Absolute Activist*.

37.     Accordingly, the Court concludes that under either the conduct and effects test set forth in Section 22(c) of the Securities Act and 27(b) of the Exchange Act, or the domestic securities transaction test set forth in *Morrison*, the federal securities laws apply to the Traffic Monsoon transactions in this case, irrespective of where the Traffic Monsoon members resided.

## II.   UNLESS RESTRAINED, IT IS REASONABLY LIKELY THAT SCOVILLE AND TRAFFIC MONSOON WILL VIOLATE THE FEDERAL SECURITIES LAWS IN THE FUTURE.

38.     The Court concludes that the Commission has shown that without an injunction there is a reasonable likelihood that Scoville and Traffic will continue to violate the federal securities laws.

39.     The Tenth Circuit has held that "[d]etermination of the likelihood of future violations requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *See SEC v. Pros International, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).  The *Pros International* Court further stated that "[a]lthough no single factor is determinative, we have previously held that the degree of scienter 'bears heavily' on the decision. *SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir.1981).  A knowing violation of §§10(b) or 17(a)(1) will justify an injunction more readily than a negligent violation of §17(a)(2) or (3).  However, if there is a sufficient showing that the violation is likely to recur, an injunction may be justified even for a negligent violation of §17(a)(2) or (3)." *Id.*

40.     The uncontroverted facts discussed above suggest that unless enjoined, Scoville and Traffic Monsoon are likely to commit further securities violations.  As stated earlier, the evidence establishes that Scoville acted with scienter in undertaking a scheme, act, practice, or course of business that operated as a fraud upon Traffic Monsoon investors.  Scoville was the architect of the Traffic Monsoon investment scheme, the sole member/shareholder of Traffic

Monsoon LLC, the sole Administrator over its servers, and the individual who bears ultimate responsibility for its business activities.

41.     The Court is further concerned that unless enjoined, Scoville is likely to get involved once again in the very same type of business that he was running at the time that this case was initiated.  By his own description, Scoville has started multiple iterations of the Traffic Monsoon scheme.  It is his primary employment and source of income.  Unless restrained, all evidence suggests that he will continue operating this or a similar scheme as soon as he is able.

42.     Importantly, Scoville has thus far refused to acknowledge any wrongdoing or accept any responsibility for his actions in this case.

43.     Taken together, the Court concludes that the Commission has satisfactorily demonstrated that, unless restrained during the pendency of this action, there is a reasonable likelihood that Scoville and Traffic Monsoon will continue to violate the federal securities laws.

## III.   THE COURT PRELIMINARILY ENJOINS SCOVILLE AND TRAFFIC MONSOON AND CONTINUES THE PREVIOUSLY ENTERED ORDER FREEZING ASSETS AND ORDER APPOINTING RECEIVER.

### A.     Preliminary Injunction

44.     Because the Commission has satisfied its burden of demonstrating a *prima facie* violation of the federal securities laws by Scoville and Traffic Monsoon, and because unless they are restrained there is a reasonable likelihood of future violations, Defendants are hereby prohibited from soliciting, accepting, or depositing any monies obtained from actual or prospective investors, individuals, customers, companies, and/or entities, through the Internet or other electronic means.

45.     Defendants and each of their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including facsimile transmissions, electronic mail or overnight delivery service, and each of them, shall, within five (5) days of receiving actual notice of this Order, take such steps as are necessary to repatriate and deposit into the registry of the Court in an interest bearing account, any and all funds or assets that presently may be located outside of the United States that were obtained directly or indirectly from Defendants or any of Defendants' investors.

46.     Defendants and each of their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including facsimile transmission, electronic mail, or overnight delivery service, are hereby restrained from destroying, mutilating, concealing, altering, disposing, or transferring custody of any items, including but not limited to any books, records, documents, correspondence, contracts, agreements, assignments, obligations, tape recordings, computer media or other property relating to Defendants.

**B.      Asset Freeze**

47.     Except as otherwise specified herein, all assets of the Defendants ("Defendants' Assets") are and remain frozen until further order of this Court, including but not limited to any accounts held at PayPal Holdings, Inc., Payza, Solid Trust Pay, Allied Wallet LTD, and JPMorgan Chase Bank, N.A.  Accordingly, all persons and entities with direct or indirect control over any of Defendants' Assets, including but not limited to the Defendants, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing,

selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Defendants' Assets that are on deposit with financial institutions such as banks, brokerage firms and mutual funds.

48.    Defendants Traffic Monsoon and Scoville, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service, facsimile service, or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of, any assets, funds, or other properties (including money, real or personal property, securities, choses in action or property of any kind whatsoever) of Defendants Traffic Monsoon and Scoville currently held by them or under their control, whether held in the name of Defendants Traffic Monsoon, LLC and/or Charles Scoville, or for their direct or indirect beneficial interest wherever situated.

## C.    Order Appointing Receiver

49.    The previously-entered Order Appointing Receiver (Doc. No. 11), together with all duties, responsibilities, and obligations set forth therein, shall remain in full force and effect until further order of this Court.

## CONCLUSION

For the foregoing reasons, the Court grants the Commission's Motion for Preliminary Injunction and Denies Scoville's Motion to Set Aside Receivership.

Dated this _____ day of _____, 2016.


_____
Honorable Jill N. Parrish
U.S. District Court, District of Utah

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I caused to be filed the forgoing using the Court's CM/ECF System.  A true and correct copy of the document was served on all parties entitled to service through the Court's CM/ECF System.

/s/ Marlea Furlong
Marlea Furlong