IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TRAFFIC MONSOON, LLC and CHARLES D. SCOVILLE,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING A PRELIMINARY INJUNCTION AND DENYING THE DEFENDANTS' MOTION TO SET ASIDE THE RECEIVERSHIP**<br><br>Case No. 2:16-cv-00832-JNP<br><br>District Judge Jill N. Parrish |

Two related motions are before the court. First, the SEC has moved for a preliminary injunction that continues the receivership and asset freeze put into place by the TRO entered by the court. Second, defendants Traffic Monsoon, LLC and Charles Scoville (collectively, Traffic Monsoon) have moved to set aside the receivership. [Docket 33]. The court GRANTS the SEC's request for a preliminary injunction and DENIES the defendants' motion to set aside the receivership.

## PROCEDURAL BACKGROUND

On July 26, 2016, the SEC moved for a TRO freezing the assets of Mr. Scoville and Traffic Monsoon and appointing a receiver for these assets. The court granted the TRO, appointed Peggy Hunt as the receiver for Mr. Scoville's and Traffic Monsoon's assets, and set a preliminary injunction hearing. Traffic Monsoon subsequently moved to set aside the receivership.

The court held evidentiary hearings on the SEC's request for a preliminary injunction and Traffic Monsoon's motion to set aside the receivership on November 1, 2016 and November 3, 2016. The parties presented legal argument on November 30, 2016.

## FINDINGS OF FACT

1. On September 29, 2014, Mr. Scoville registered Traffic Monsoon with the State of Utah as a limited liability company. Hearing Transcript ("Tr.") 29–32; Ex. 1, tab 1. Organizational documents filed with the State of Utah identify Mr. Scoville as Traffic Monsoon's sole member, manager and registered agent. The documents list his Murray, Utah, apartment as Traffic Monsoon's corporate address. Ex. 1, tab 1.

2. Traffic Monsoon was operated by Mr. Scoville through a website with the address www.trafficmonsoon.com. Tr. 12; Ex. 1 ¶ 8. The website prominently identified Traffic Monsoon as a "revenue sharing advertising company." Docket 64-2, p. 2.

3. Traffic Monsoon operated as a web traffic exchange that sold several different products designed to deliver "clicks" or "visits" to the websites of its customers. Tr. 12-17. The exclusive method of purchasing these services was through the website. Tr. 12, 127.

4. These purchased visits are of value to website owners because they make the website appear more popular than it actually is. Because search engines such as Google employ algorithms that prioritize more frequently visited websites over less frequently visited websites, these paid visits tended to result in a higher ranking on a search engine query.

5. Individuals who wished to purchase services from Traffic Monsoon would create an account and became "members" of the Traffic Monsoon website.

6.  A large majority of the financial transactions the members completed with Traffic Monsoon—both payments made to Traffic Monsoon and withdrawals from the member's account—were conducted through PayPal. Tr. 19, 54.

7.  Traffic Monsoon sold 1,000 website visits for $5.95 and 20 clicks on a member's banner ad for $5.00. Tr. 17-18, 246-47.

8.  Traffic Monsoon's most popular product by a large margin, however, was the Banner AdPack (AdPack). AdPacks, which could be purchased for $50, bundled 1,000 website visits and 20 clicks to the member's banner ad. What set this product apart (and justified the additional cost for identical services that could be purchase à la carte for just $10.95) is that the AdPack permitted the purchaser to share in the revenues of Traffic Monsoon by receiving credits in the member's account up to a maximum amount of $55 per AdPack.

9.  To qualify for this AdPack revenue sharing, the member had to click on a number of websites each day. The number of required clicks increased over time, but the member was ultimately obligated to click on 50 ads and remain on each website for five seconds. This took the member a little over four minutes per day. The member's obligation to click on 50 ads for five seconds each did not scale with the number of AdPacks purchased. Whether the member owned 1 or 1,000 AdPacks, he or she was obligated to click on only 50 ads per day and remain on the website to which the member was directed for five seconds each in order to participate in revenue sharing.

10. 99% of AdPack buyers qualified for some portion of revenue sharing after their purchase of an AdPack. Tr. 260-61; Ex. 5.

11. Traffic Monsoon members also were entitled to a 10% commission on all products—including AdPacks—that were purchased by individuals whom the member referred to Traffic Monsoon. Tr. 301-02. This 10% commission was paid on all future purchases made by the referred member, including when the referred member rolled over revenues from existing AdPacks to purchase new AdPacks. Tr. 20–21.

12. Mr. Scoville stated in emails to the SEC that he allocated the $50 purchase price of an AdPack as follows: 10% was deposited in the referring member's account, 4.5% was retained by Traffic Monsoon, 1.5% went to Traffic Monsoon's programmer in Russia, and the remaining 84% either was distributed to other AdPack holders who had qualified in the past 24 hours or was placed in a reserve fund. Ex. 110. The amount placed in the reserve fund for future sharing was used to even out fluctuations in the amount of money flowing into the member accounts. Ex. 110. In other words, out of the $50 purchase price, the referring member received $5, Traffic Monsoon and its programmer received $6, and the remaining $39 was either shared with other qualified AdPack holders or placed in a reserve fund for future distribution.

13. Mr. Scoville kept no accounting records for Traffic Monsoon. Ex. 1, tab 6. So there are no readily available documents that describe precisely how the money was distributed. After the receiver in this case conducted a preliminary investigation of how Traffic Monsoon distributed the money it received, she expressed some doubt as to whether the funds were distributed in the exact manner that Mr. Scoville described. Tr. 25–26. Rather, it appeared that the money coming into Traffic Monsoon was simply pooled together and then paid out as needed. *Id.*

14. At any rate, neither the website nor any other publicly available source of information informed the members how Traffic Monsoon split revenue between itself and qualified AdPack holders. So long as Traffic Monsoon shared some undefined portion of the revenue coming into the company with qualified AdPack holders and paid out a 10% commission, Mr. Scoville was free to distribute the money however he wished.

15. AdPack purchasers typically received about $1 per day in revenue sharing per AdPack purchased. Tr. 296. These revenue sharing payments would appear as credits in the member's Traffic Monsoon account. The member could then use these credits to purchase additional AdPacks or to purchase Traffic Monsoon's other services. The member could also convert these credits into real currency by performing an electronic transfer to a bank account.

16. If the owner of an AdPack consistently performed his or her daily obligation to click on 50 ads, the owner would typically recoup the original $50 payment, plus an additional $5 in profit in about 55 days.  If the member continually purchased a new AdPack after the previous AdPack matured, he or she could reap an impressive 66% annual return on the $50 investment.[1] The member could earn even more money by convincing others to buy AdPacks.

17. Thus, for all $50 AdPacks that were purchased by a referred member, Traffic Monsoon typically deposited $60 worth of credits in member accounts: $55 into the

_____

[1] This calculation does not take into account compound interest. If a customer purchased multiple AdPacks and continually reinvested the resulting revenue stream by purchasing new AdPacks, higher annual rates of return were possible.

purchasing member's account over a 55-day period (so long as the member qualified) and $5 into the referring member's account.

18. When a customer purchased an AdPack, he or she agreed to be bound by several terms and conditions. Some of these terms and conditions are as follows:

   a. "TrafficMonsoon[2] registered as a limited liability company and not a bank nor a security firm. A purchase of advertising service with us is not considered a deposit, nor investment." Docket 64-2, p. 44.

   b. "You agree to recognize TrafficMonsoon as a true advertising company which shares its revenues, and not as any form of investment of any kind." Docket 64-2, p. 44.

   c. "The information, communications and / or any materials TrafficMonsoon contains are for educational purposes, and is [sic] not to be regarded as solicitation for investments in any jurisdiction which deems a non-public offers or solicitations [sic] unlawful, nor to any person whom it will be unlawful to make such an offer and / or solicitation." Docket 64-2, p. 45.

   d. "You agree that our past performance does not guarantee you the same result in the future." Docket 64-2, p. 44.

19. The Traffic Monsoon website also makes a number of representations regarding its services. Some of those representations are as follows:

   a. "Only 1 of the services we offer includes a revenue sharing position. We do not sell 'shares.' We only sell advertising services. It's from the sales of all our

---

[2] On its website, Traffic Monsoon often identifies itself as "TrafficMonsoon." Because the company is registered as "Traffic Monsoon," the court uses this version of its name.

services that we share revenues. When our members purchase a service from TrafficMonsoon, the revenues from that purchase are held by the company. Then, you can qualify to receive share [sic] of the profits! Naturally there is cost associated with providing services. Each service provided generates a profit margin. We share those profits with you! . . . As long as you are qualified, each sharing position you receive with your AdPack Combo purchase will continue to share in revenue up to $55.00. Reaching this maximum is not guaranteed, or affixed to any time frame. It's completely reliant upon sales of services, and you being qualified." Docket 64-2, p. 19.

b. "Is TrafficMonsoon a hyip, Ponzi, pyramid scheme, or illegal? What is a Ponzi? ponzis [sic] are investment schemes which offer interest payments. they [sic] pay interest from new investor principle deposits. If you add together the interest earned total and principle total, there would be a debit balance created. Sufficient funds would not be available to pay people their principles and interest. . . . Why is Traffic Monsoon not a Ponzi? Traffic Monsoon only offers ad services. Nothing else is for sale than ad service. There is no investment plan offered. Yes, you can qualify to share in the sales revenue generated when services are sold by actively viewing other people's websites, but this is not interest. . . . New sales of advertising service generate new earnings. That's not a ponzi. . . . In conclusion, when looking at pure definitions, Traffic Monsoon is not a ponzi . . . ." Docket 64-2, p. 31.

c. "[W]e cannot guarantee the amount you'll receive per day, but as long as you are qualified to receive share [sic] in site revenues, you'll continue to receive

7

of revenues [sic] on each sharing position up to $55. This also means we do
not guarantee reaching $55, because earnings from revenue sharing is
completely dependent upon the sale of ad services, and also dependent upon
you meeting the qualification to receive of revenues [sic] . . . ." Docket 64-2,
p. 36.

20. Despite these disclaimers, the Traffic Monsoon website also promoted the AdPacks as
a way to make money: "There are really 4 opportunities to earn with traffic monsoon
[including revenue sharing through AdPacks]. . . . Each one can be your main focus,
or all of them. Naturally, the more you utilize all 4 of these ways to earn money, the
more you'll earn." Docket 64-2, p. 33.

21. By a large margin, AdPacks were Traffic Monsoon's most popular product. The sale
of AdPacks constituted over 98% of all Traffic Monsoon revenue. Tr. 17, 274. Thus,
over 98% of the revenue sharing distributed to qualified AdPack owners came from
the sale of other AdPacks. The Traffic Monsoon website did not inform members that
almost all of the revenue that was shared with qualified AdPack owners was
generated by the sale of new AdPacks.

22. Approximately 90% of the Traffic Monsoon members who purchased AdPacks reside
outside of the United States and presumably purchased the AdPacks while located in
their home countries. Complaint at ¶ 66.

23. Some individuals initially purchased AdPacks principally as a way to promote their
online businesses. But for many members, the profits that could be reaped from the
AdPacks themselves quickly eclipsed this motive. Tr. 180–86.

24. Traffic Monsoon member correspondence with the receiver evidences that Traffic Monsoon customers' primary motivation in purchasing AdPacks was to earn the $5 return on each AdPack, not to receive the advertising services that were available for only $10.95 if purchased separately from the AdPack. Tr. 74-76, 84-85. Indeed, many members have not received or used the web visits and banner clicks purchased in the AdPack. Tr. 181-186. A number of members indicated that they had invested their "life savings" or "savings" by purchasing AdPacks. Ex. 3, p. 7 & tab 8.

25. By Traffic Monsoon's own description, it has delivered only 1.6 billion website visits out of the 17.5 billion that have been purchased by Traffic Monsoon members. Tr. 82-84. In other words, it has delivered only 10% of the web traffic purchased by members through the sale of AdPacks. It would cost Traffic Monsoon tens of millions of dollars to acquire and deliver the billions of web visits it owes to its members.

26. Many individuals began to purchase or accumulate hundreds or even thousands of AdPacks. Tr. 23; Exs. 11, 12.

27. Members typically did not cash out an AdPack when it matured. Instead, they rolled over the money deposited in their accounts by purchasing another AdPack. Tr. 20. In order to maximize their returns, members purchased dozens or hundreds of AdPacks. They would then use the revenue from the existing AdPacks to purchase new AdPacks as soon as they had enough money in their account to do so. Thus, members that owned hundreds of AdPacks, which could return thousands of dollars in shared revenues, typically had relatively little money in their account because the members would continually reinvest it by purchasing new AdPacks. Ex. 10.

28. If the members rolling over money in their accounts had been referred by another member for the 10% commission, these rollover transactions also generated commission payments to the referring members. Tr. 20–21. Therefore, if the referred member purchased a single AdPack for $50 and then rolled the proceeds over into a new AdPack every 55 days, the referring member would reap $30 in commissions in less than one year.

29. Enticed by these commission payments, Traffic Monsoon members promoted the AdPacks to others. Several members actively promoted the AdPacks online or through presentations as a money making opportunity with slogans such as "If You Can Click a Mouse. [sic] You Can Get Paid!!" Tr. 88–89, 210–11. Ex. 3, tab 19.

30. After making an initial investment to purchase multiple AdPacks, a member could accumulate an ever-growing number of AdPacks by purchasing additional AdPacks with the 10% profit the member acquired over a 55-day period. For example, if a member initially invested $5,000 by purchasing 100 AdPacks and only rolled over the principal amount in new AdPacks, the member could purchase about 166 AdPacks at the end of one year by reinvesting the principal and profit into new AdPacks. If the same member continued this pattern of rolling over the principal amount and investing the profit at the end of the year, the member could purchase around 275 AdPacks at the end of the second year and 456 AdPacks at the end of the third. If the member then allowed these 456 AdPacks to mature, he or she could accumulate

$25,080—over five times the initial investment.[3] If the member were able to convince family or friends to make similar bulk purchases of AdPacks, the member could reinvest the resulting 10% commission and acquire even more AdPacks.

31. Between October 2014 and July 2016, Traffic Monsoon members worldwide paid Traffic Monsoon $173 million in new money to purchase 3.4 million AdPacks. Tr. 270-77; Ex. 6. Traffic Monsoon members purchased approximately 14 million additional AdPacks for $700 million during that same period by rolling over their revenue-sharing payments into the purchase of these new AdPacks. *Id.* During that same period, Traffic Monsoon members paid approximately $2.9 million for all other Traffic Monsoon products combined. *Id.*

32. Out of the $175.9 million total paid into Traffic Monsoon by its members, approximately $88.4 million has been paid back out to its members, leaving a difference of $87.4 million between what has been paid in by members and what they have taken out. Tr. 278-81; Ex. 7.

33. In January, 2016, PayPal became concerned about the enormous growth in the volume of transactions between Traffic Monsoon and its members, and it froze Traffic Monsoon's account. Tr. 26, 137.

34. The PayPal freeze significantly reduced the amount of money that was flowing into Traffic Monsoon. Tr. 26. Traffic Monsoon then began to transition to other electronic payment processors such as Payza, Allied Wallet, and SolidTrustPay. Tr. 27. With the

---

[3] This hypothetical assumes that the member retained all profits in the member account and only reinvested the profits at the end of the one-year period. If the member reinvested the profits by purchasing additional AdPacks at the end of each 55-day cycle, as members typically did, the returns would be even higher.

introduction of these new payment processors, AdPack transactions began to rise again. Tr. 27.

35. Traffic Monsoon's resurgence was halted on July 26, 2016, when this court froze its assets and appointed a receiver.

36. The current combined account balance of Traffic Monsoon members is $34.2 million. Tr. 284-86; Ex. 7. If the outstanding AdPacks currently owned by Traffic Monsoon members had matured, the account balance would swell by an additional $243.9 million, for a combined balance of $278.1 million. *Id.*

37. The receiver currently has between $50-$60 million in frozen Traffic Monsoon assets. Tr. 110.

## ANALYSIS

The SEC alleges in its complaint that Traffic Monsoon's sale of AdPacks constituted an illegal Ponzi scheme that violated Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5(a) and (c) promulgated thereunder. The SEC also alleges that Traffic Monsoon violated Section 17(a)(1) and (3) of the Securities Act of 1933 (Securities Act).[4] [Docket 2, ¶¶ 84–92].

Section 10(b) of the Exchange Act makes it unlawful for a person to "use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this statutory grant of authority, the SEC adopted Rule 10b-5. Subsections (a) and (c) of this rule provide:

---

[4] The SEC further alleges that Traffic Monsoon violated Sections 5(a) and (c) of the Exchange Act by selling unregistered securities. *See* 15 U.S.C. § 77e(a) and (c). But the SEC does not rely on this allegation to support its request for a preliminary injunction.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, . . . or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In order to prevail on its Rule 10b-5 claims, the SEC must prove that Mr. Scoville committed the acts described in either subsection (a) or (c) with the requisite scienter, which has been defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The scienter requirement may be satisfied with proof of either intent to defraud or recklessness.[5] *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001).

Section 17(a)(1) and (3) of the Securities Act similarly states:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or . . . (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). In order to prevail on its "device, scheme, or artifice to defraud" claim under subsection (1), the SEC must also prove that Mr. Scoville acted knowingly or intentionally.[6]

---

[5] "Recklessness is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (citation omitted).

[6] Counsel has not provided the court with legal authority on the question of whether the knowing and intentional requirement for Section 17(a)(1) includes reckless behavior. *See Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980) ("We have no occasion here to address the question . . . whether, under some circumstances, scienter may also include reckless behavior."). It appears that the Tenth Circuit has only directly endorsed the recklessness standard in connection with Rule 10b-5

*Aaron v. SEC*, 446 U.S. 680, 696 (1980). Subsection (3), however, does not incorporate a scienter requirement. *Id.* Proof of negligence alone will suffice to establish a violation of this subsection. *See SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 n.9 (D. Colo. 2014).

The SEC argues that it will likely succeed in proving its claims under Rule 10b-5 and Section 17(a) and requests a preliminary injunction freezing Traffic Monsoon's assets until this case is resolved. In response to the SEC's request for a preliminary injunction, and in support of its own motion to set aside the receivership, Traffic Monsoon presents two main arguments.

First, Traffic Monsoon relies upon *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), arguing that Section 10(b), upon which Rule 10b-5 depends, and Section 17(a) do not authorize this court to enjoin activity related to foreign transactions. It asserts that because approximately 90% of its customers purchased AdPacks over the internet while located outside the United States, the SEC cannot regulate these transactions. Traffic Monsoon, therefore, contends that any injunction freezing its assets must be limited to assets sufficient to refund money paid to it by customers who purchased AdPacks while they were located within the territorial boundaries of the United States.

Second, Traffic Monsoon argues that this court should not issue an injunction because the SEC has not adequately shown that it will prevail on the merits.

---

claims. *See Dronsejko*, 632 F.3d at 665; *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1257–58 (10th Cir. 2001); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232–33 (10th Cir. 1996); *Hackbart v. Holmes*, 675 F.2d 1114, 1117–18 (10th Cir. 1982). Because the question of whether the scienter requirement of Section 17(a)(1) may be satisfied by a showing of recklessness is not determinative here, the court need not resolve this uncertainty at this juncture.

The court addresses each of Traffic Monsoon's arguments in turn. The court then addresses Traffic Monsoon's objections to some of the terms of the SEC's proposed injunction. Finally, the court certifies this order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

I.   **APPLICABILITY OF SECTION 10(b) AND SECTION 17(a) TO ADPACKS PURCHASED OUTSIDE OF THE UNITED STATES**

A.   *Morrison* **and the Presumption Against the Extraterritorial Application of Statutes**

Prior to the Supreme Court's *Morrison* opinion, most of the circuits applied one version or another of the conduct and effects test to determine whether an extraterritorial securities transaction fell within the ambit of Section 10(b) and Rule 10b-5. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 257–59 (2010). Under this test, Section 10(b) could be applied to an extraterritorial transaction if significant wrongful conduct related to the transaction occurred in the United States or if "the wrongful conduct had a substantial effect in the United States or upon United States citizens." *Id.* at 257 (citation omitted).

In *Morrison*, the Supreme Court reviewed the Second Circuit's application of the conduct and effects test in a case in which Australian citizens purchased shares of an Australian bank on an Australian stock exchange. *Id.* at 251–52. As a preliminary matter, the Court held that the Second Circuit erred in its conclusion that "the extraterritorial reach of § 10(b) [raises] a question of subject-matter jurisdiction." *Id.* at 253. The Court clarified that the limits on a district court's authority to adjudicate a Section 10(b) claim based upon a foreign transaction are not jurisdictional in nature because 15 U.S.C. § 78aa(a) conferred jurisdiction over suits to enforce the provisions of the Exchange Act to the district courts. *Id.* at 254.

15

The Court then went on to analyze the language of Section 10(b) to determine whether Congress intended the statute to be applied outside of the United States. Because the statute is silent on this issue, the Court employed the canon of construction "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id*. at 255 (citation omitted). Under this judicially created presumption, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" *Id*. (citation omitted).

In order to overcome this presumption against the extraterritorial application of a statute, Congress does not necessarily have to include a clear statement in the statute that says "this law applies abroad."[7] *Id*. at 265. Instead, the context provided by related statutory provisions can be consulted to determine if the presumption should be applied. *Id*. Indeed, "all available evidence about the meaning" of a statute—including the history of amendments to the statute, the text of other provisions found within the larger statutory scheme, the underlying purpose of the statute,

---

[7] Some commentators had interpreted *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) (*Aramco*) to embrace a "clear statement rule," which requires a clear statement in the statute itself to overcome the presumption against extraterritoriality. *See id*. at 258 ("Congress' awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute."); *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 73 (2d Cir. 1994) ("The *Aramco* dissent and some commentators have interpreted the majority opinion in *Aramco* as setting forth a 'clear statement' rule, such that the presumption against extraterritoriality cannot be overcome absent a clear statement in the statute itself."). But *Morrison* and other Supreme Court opinions have since clarified that the presumption is not governed by a "clear statement rule." *Morrison*, 561 U.S. at 265 ("[W]e do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a 'clear statement rule,' if by that is meant a requirement that a statute say 'this law applies abroad.'" (citation omitted)); *see also Sale*, 509 U.S. at 176–77 & n.33; *Smith*, 507 U.S. at 201–03 & n.4.

16

and legislative history[8]—should be consulted to determine whether the presumption has been overcome. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 176–77 & n.33 (1993); *see also Smith v. United States*, 507 U.S. 197, 201–03 & n.4 (1993) (examining surrounding statutes and legislative history to determine whether the Federal Tort Claims Act applies to extraterritorial conduct); *United States v. Spelar*, 338 U.S. 217, 222 (1949) (looking to "the language of [a] statute and the legislative purpose underlying it" to determine whether the presumption had been overcome); *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 73 (2d Cir. 1994) ("[T]he Supreme Court has made clear . . . that reference to nontextual sources is permissible" to determine whether the presumption had been overcome); William S. Dodge, *Understanding the Presumption Against Extraterritoriality*, 16 BERKELEY J. INT'L L. 85, 110–12 (1998) (stating that "the lower courts . . . have been unanimous in concluding that the presumption against extraterritoriality is not a clear statement rule" and that courts should refer to other indicia of congressional intent).

In determining whether the presumption against the extraterritorial application of Section 10(b) had been overcome, the *Morrison* Court examined several related statutes to determine whether they evidenced a congressional expression of intent that 10(b) be applied beyond the borders of the United States. The Court found that the presumption had not been defeated for two principal reasons. First, the Court examined three related statutes—15 U.S.C. § 78c(a)(17), 15 U.S.C. § 78b(2), and 15 U.S.C. § 78dd(b)—and determined that any inference afforded by these

---

[8] Although legislative history generally may not be consulted to interpret clear statutory language, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 254 (2010) (Scalia, J., concurring), the Supreme Court has consulted legislative history to determine whether the presumption against extraterritoriality may be overcome because what is at issue is not the meaning of unambiguous statutory text, but rather how to interpret legislative silence on the extraterritorial reach of a statute.

statutes that Congress intended the extraterritorial application of Section 10(b) was too uncertain to overcome the presumption. *Morrison*, 561 U.S. at 262–65. Second, the Court expressed its concern that there was no textual support in the Exchange Act for either the conduct and effects test that had been created by the circuit courts or an alternate test proposed by the Solicitor General that would permit the extraterritorial application of Section 10(b) under certain circumstances. *Id*. at 261 ("The results of judicial-speculation-made-law [i.e., the conduct and effects test]—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality."); *Id*. at 270 ("Neither the Solicitor General nor petitioners provide any textual support for this [significant and material conduct] test."). It expressed its reticence to engage in "judicial lawmaking" by creating or endorsing an extraterritorial application test made from whole cloth. *See id.* at 261 n.5.

The *Morrison* Court therefore concluded that the presumption against extraterritorial application had not been overcome and rejected the conduct and effects test. *Id.* at 265–66. In its place, the Court created a transactional test. Analyzing the language of Section 10(b), which prohibits manipulative or deceptive devices used "in connection with the purchase or sale of any security," the Court determined that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 266. Thus, *Morrison* held that Section 10(b) and Rule 10b-5 could only be applied "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id*. at 273.

**B.  Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer**

**Protection Act**

At the same time that *Morrison* was pending in the Supreme Court, Congress was in the process of amending both the Securities Act and the Exchange Act through the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank). Signed into law less than a month after the Supreme Court issued *Morrison*, Section 929P(b) of Dodd-Frank added the following language to both Section 22 of the Securities Act and Section 27 of the Exchange Act:

> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of [either Section 10(b) of the Securities Exchange Act or Section 17(a) of the Securities Act] involving--
>
> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
>
> (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P(b), 124 Stat. 1376, 1864–65 (2010); *see also* 15 U.S.C. §§ 77v(c), 78aa(b). Thus, Dodd-Frank clarified that United States district courts have jurisdiction over a Section 10(b) action or a Section 17(a) action brought by the SEC if the conduct and effects test has been satisfied.

The SEC and Traffic Monsoon dispute whether Section 929P(b) of Dodd-Frank reinstated the conduct and effects test that had just been repudiated in *Morrison*, or whether Section 929P(b) left the *Morrison* transactional test in place. Traffic Monsoon correctly asserts that the plain language of Section 929P(b) did not explicitly overturn the core holding of *Morrison*. As noted above, *Morrison* overruled precedent in the circuit courts holding that the

extraterritorial reach of Section 10(b) implicates the jurisdiction of the court to hear the case. 561 U.S. at 253–54. *Morrison* clarified that there was no jurisdictional impediment to the extraterritorial application of Section 10(b); it was the meaning of the language of the statute itself—as viewed through the lens of the presumption against extraterritorial application—that prohibited courts from applying Section 10(b) to transactions occurring outside of the United States. *Id.* at 255, 262–65. Thus, Section 929P(b), which addresses only the jurisdiction of the courts, does not overtly expand the extraterritorial reach of the language of Section 10(b) or Section 17(a).

Traffic Monsoon argues that because the plain language of Section 929P(b) does not directly address the application of the Securities Act or the Exchange Act to foreign transactions, the *Morrison* test remains in effect.[9] If the Supreme Court had adopted a "clear statement rule," *see supra* n.7, Traffic Monsoon's argument would likely carry the day. But the Court has rejected this rule and recognized that the judicial presumption against the extraterritorial application of a statute may be rebutted by referring to "all available evidence about the meaning" of a statute—including the context provided by related statutes, history of amendments, underlying purpose, and legislative history. *Sale*, 509 U.S. at 176–77 & n.33. The presumption against extraterritorial application is, in essence, a judicial guess as to what Congress would have wanted when the statute is silent on this issue. Contrary indications of congressional intent short of a clear

---

[9] Traffic Monsoon asserts, for example, that in order to overcome the presumption against extraterritorial application, this court would have to use legislative history to arrive at a tortured reading of Section 929P(b) that contradicts its plain language. But Traffic Monsoon sets the bar too high. In order to find that the presumption has been rebutted, this court need not conclude that the language of Section 929(b) *requires* the extraterritorial application of Sections 10(b) and 17(a). The presumption may be defeated if Section 929(b) sufficiently *evidences* congressional intent that Sections 10(b) and 17(a) be applied outside the borders of the United States.

statement may be sufficient to rebut the presumption. In order to determine whether the presumption has been overcome in this case, the court must determine whether Section 929P(b), which was not in place when *Morrison* was decided and was not considered by the Supreme Court, provides a sufficient indication of congressional intent to apply Sections 10(b) and 17(a) to certain extraterritorial transactions.

The legal landscape when Section 929P(b) was initially proposed and considered by congress is vital to discerning this congressional intent. As noted above, the circuit courts had applied the conduct and effects test for almost four decades until *Morrison* rejected it. *See Morrison*, 561 U.S. at 256–60 (describing the evolution of the conduct and effects test in the Second Circuit and noting that other circuits have adopted it as well); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972) (holding that either conduct or effects in the United States may justify the application of Section 10(b) to a securities transaction). These circuit courts held that this conduct and effects test was jurisdictional in nature. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 169–71, 176 (2d Cir. 2008); *Cont'l Grain (Australia) Pty. Ltd. v. Pac. Oilseeds, Inc.*, 592 F.2d 409, 421 (8th Cir. 1979); *Gottfried v. Germain (In re CP Ships Ltd. Sec. Litig.)*, 578 F.3d 1306, 1313 (11th Cir. 2009). Therefore, the prevailing view of the law prior to *Morrison* was that satisfying the conduct and effects test was essential to the jurisdiction of a court to adjudicate a dispute arising under Section 10(b).

It was in this pre-*Morrison* legal context that Congress first drafted and considered the language that would become Section 929P(b) of Dodd-Frank. In the 2008 *Morrison* opinion issued by the Second Circuit, the court recognized that Congress had not explicitly defined the federal courts' jurisdiction to apply Section 10(b) to transactions occurring outside the United States and urged Congress to address this omission. *Morrison v. Nat'l Australia Bank Ltd.*, 547

21

F.3d 167, 170 n.4 (2d Cir. 2008) ("We respectfully urge that this significant omission receive the appropriate attention of Congress and the Securities and Exchange Commission."). In response to this invitation, Congress did just that. On October 15, 2009, the core of the language that would later become Section 929P(b) of Dodd-Frank was included in a bill introduced in the House of Representatives that was designed to "provide the Securities and Exchange Commission with additional authorities to protect investors from violations of the securities laws." Investor Protection Act of 2009, H.R. 3817, 111th Cong. § 216 (2009). This language was later introduced in a separate bill that would become the Dodd-Frank Act, which was passed by the House on December 11, 2009.  Dodd-Frank, H.R. 4173, 111th Cong. § 7216 (as passed by the House, Dec. 11, 2009). The Senate passed an amended version of the bill on May 20, 2010 that excluded the Section 929P(b) language. *Id.* (as passed by the Senate, May 20, 2009). The House and Senate versions of the bill were then referred to a conference committee for reconciliation. The conference committee first met on June 10, 2010 and held its last meeting on June 24, 2010. CONGRESS.GOV, Actions Overview H.R. 4173—111th Congress (2009–2010), https://www.congress.gov/bill/111th-congress/house-bill/4173/actions.  On June 29, 2010, the committee issued a conference report that contains the final version of the bill, including Section 929P(b) in its present form. 156 CONG. REC. H5103 (daily ed. June 29, 2010) (conference report on Dodd-Frank). The House and the Senate each passed the conference committee version of the bill and Dodd-Frank was signed into law on July 21, 2010. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P(b), 124 Stat. 1376 (2010).

Meanwhile, the Supreme Court issued *Morrison* on June 24, 2010. Thus, the Court altered the legal landscape regarding the jurisdiction of courts to adjudicate claims involving foreign transactions only on the last day on which the conference committee convened to

22

hammer out the final version of Dodd-Frank, which was only five days before the committee published the final version of the bill and less than a month before it was signed into law. Accordingly, the language that would become Section 929P(b) was drafted and initially considered by Congress at a time when the prevailing law dictated that the question of whether an extraterritorial transaction could be scrutinized for violations of Sections 10(b) or 17(a) was jurisdictional in nature.

In this pre-*Morrison* context, Section 929P(b) merely codified the prevailing Second Circuit rule that courts had both jurisdiction and statutory authority to adjudicate a Section 10(b) claim if the conduct and effects test had been satisfied. Indeed, the committee report for the language that would later become Section 929P(b) explicitly stated that the language codified the conduct and effects test as it then existed:

> Courts have previously ruled that Federal securities laws are silent as to their transnational reach, so two court tests—the conduct test and the effects test—have emerged for making such determinations and different courts apply different tests. This section would codify the SEC's authority to bring proceedings under both the conduct and the effects tests developed by the courts regardless of the jurisdiction of the proceedings.

H.R. REP. No. 111-687, pt. 1, at 80 (2009).

The fact that the Supreme Court issued *Morrison* on the last day that the conference committee met to negotiate a reconciliation between the House and Senate bills, and five days before the final version of the bill was published, does not convincingly demonstrate that Congress had changed its mind about codifying the conduct and effects test. Although courts generally presume that Congress is familiar with the precedents of the Supreme Court when it enacts legislation, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698–99 (1979), the close proximity between the date when *Morrison* was issued and the date when the language of Dodd-Frank was

finalized, greatly undermines this presumption. It strains credulity to assume that legislators read *Morrison* on the last day that they met to negotiate the final version of a massive 850-page omnibus bill designed to overhaul large swaths of the United States financial regulations and consciously chose to enact Section 292P(b) against the background of the fundamental shift in securities law brought about by *Morrison*. Given this timing, the more reasonable assumption is that *Morrison* was issued too late in the legislative process to reasonably permit Congress to react to it.  To conform Section 929P(b) to the *Morrison* opinion at the last minute would be like requiring a steaming battleship to turn on a dime to retrieve a lifejacket that fell overboard. Thus, the court does not presume that Congress intended Section 929P(b) to be a nullity.

Indeed, when the final version of Dodd-Frank was presented to the House and the Senate for approval, congressmen from both chambers expressed their understanding that Section 929P(b) codified the conduct and effects test. On June 30, 2010, Representative Paul Kanjorski, who initially drafted the Section 929P(b) language, spoke in favor of the final version of Dodd-Frank when it was presented in the House. 156 CONG. REC. H5235, H5237 (daily ed. June 30, 2010). Representative Kanjorski confirmed that the purpose of Section 929P(b) was to codify the conduct and effects test:

> [T]he purpose of the language of section 929P(b) of the bill is to make clear that in actions and proceedings brought by the SEC or the Justice Department, the specified provisions of the Securities Act, the Exchange Act and the Investment Advisers Act may have extraterritorial application, and that extraterritorial application is appropriate, irrespective of whether the securities are traded on a domestic exchange or the transactions occur in the United States, when the conduct within the United States is significant or when conduct outside the United States has a foreseeable substantial effect within the United States.

*Id.* at H5237. He went on to acknowledge that *Morrison* had been decided just six days earlier and that the basis for the Supreme Court's opinion was the presumption against extraterritorial application. *Id.* Representative Kanjorski then explained that Section 929P(b)'s "provisions concerning extraterritoriality, however, are intended to rebut that presumption by clearly indicating that Congress intends extraterritorial application in cases brought by the SEC or the Justice Department." *Id.* Similarly, Senator Jack Reed noted in the Senate debate on the final version of Dodd-Frank that the bill contained

> extraterritoriality language that clarifies that in actions brought by the SEC or the Department of Justice, specified provisions in the securities laws apply if the conduct within the United States is significant, or the external U.S. conduct has a foreseeable substantial effect within our country, whether or not the securities are traded on a domestic exchange or the transactions occur in the United States.

156 CONG. REC. S5915–16 (daily ed. July 15, 2010). Thus, both the legal context in which the Section 929P(b) language was drafted and the legislative history of this provision indicate a legislative intent to apply Sections 10(b) and 17(a) to extraterritorial transactions if the conduct and effects test can be satisfied.

In addition, the text of Dodd-Frank suggests that Congress intended Sections 10(b) and 17(a) to be applied to certain extraterritorial transactions. First, the title of Section 929P of Dodd-Frank is "STRENGTHENING ENFORCMENT BY THE COMMISION [SEC]." This title suggests an intent to expand the SEC's authority to regulate deceptive or fraudulent practices through Section 929P(b), rather than an intent that the language of this subsection have no effect. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (citation omitted)). Second, Section 929Y of Dodd-Frank directs the SEC to conduct a

25

study to determine whether private rights of action under Section 10(b) should be extended to cover transactions that satisfy the same conduct and effects test laid out in Section 929P(b). Commissioning such a study demonstrates Congress's expectation that it had already extended the SEC's authority to bring an enforcement action in Section 929P(b).

Furthermore, the operative language of Section 929P(b) strongly indicates Congress's intent that Sections 10(b) and 17(a) be applied to extraterritorial transactions. By clarifying that the district courts of the United States have jurisdiction over a Section 10(b) or 17(a) claim brought by the SEC so long as the conduct and effects test has been satisfied, Congress necessarily expressed its understanding that Sections 10(b) and 17(a) may be applied extraterritorially—at least to the extent that the conduct and effects test may be met. It would be pointless to clarify that district courts had jurisdiction to hear Section 10(b) and 17(a) claims based on certain extraterritorial transactions unless Congress also intended that these statutes be applied extraterritorially. *See Bell v. New Jersey*, 461 U.S. 773, 784–86 (1983) (holding that an amendment to a statutory scheme that necessarily presumes a particular interpretation of an existing statute is a persuasive indication of the meaning of the existing statute); *South Carolina v. Regan*, 465 U.S. 367, 392 (1984) ("[S]ubsequently *enacted* provisions and the legislative understanding of them are entitled to 'great weight' in construing earlier, related legislation." (citation omitted)); Larry M. Eig, Congressional Research Service, 97-589, Statutory Interpretation: General Principles and Recent Trends 48 (2011), https://fas.org/sgp/crs/misc/97-589.pdf ("Other statutes may be expressly premised on a particular interpretation of an earlier statute; this interpretation may be given effect, especially if a contrary interpretation would render the amendments pointless or ineffectual."). Moreover, the fact that Congress chose to employ a conduct and effects test, which had been employed in the circuit courts for nearly four

26

decades to determine when a party could enforce Section 10(b), can hardly be a coincidence. The use of this familiar test indicates an intent to codify the conduct and effects test as it had been applied in the circuit courts—to determine the reach of Section 10(b) to regulate foreign transactions.

Finally, a contrary interpretation of the legislative intent animating Section 929P(b) would require the court to assume that Congress intended the amendment be a nullity. To assume that Congress intended this amendment to be mere surplusage, with no discernable effect, flies in the face of reason. *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (Courts "are 'reluctant to treat statutory terms as surplusage in any setting.'" (citation omitted)); *Washington Mkt. Co. v. Hoffman*, 101 U.S. 112, 115–16 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

In sum, the text of Section 929P(b), the legal context in which this amendment was drafted, legislative history, and the expressed purpose of the amendment all point to a congressional intent that, in actions brought by the SEC,[10] Sections 10(b) and 17(a) should be applied to extraterritorial transactions to the extent that the conduct and effects test can be satisfied.[11] The court concludes that these clear indications that Congress intended Sections 10(b) and 17(a) to be applied to foreign transactions are sufficient to overcome the presumption against extraterritorial application.

---

[10] Section 929P(b) is explicitly limited to actions brought by the SEC or the United States. Thus, *Morrison* would still control in a private cause of action brought under Section 10(b).

[11] Section 929P(b) also rebuts the *Morrison* opinion's criticism that the conduct and effects test had been created by the circuit courts without any textual justification. *See Morrison*, 561 U.S. at 261 & n.5, 270. This provision provides the missing statutory basis for the test.

### C.  Application of the Conduct and Effects Test

The court determines that the test for determining whether the Rule 10b-5 (under Section 10(b)) and Section 17(a) may be applied to any alleged foreign transactions is the conduct and effects test laid out in Section 929P(b) of Dodd-Frank. Under this test, Rule 10b-5 and Section 17(a) may be applied to violations of these provisions that involve: "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P(b), 124 Stat. 1376, 1864–65 (2010); *see also* 15 U.S.C. §§ 77v(c), 78aa(b).

Even if some of the securities transactions at issue in this case are deemed to be foreign transactions, the conduct and effects test has been satisfied in this case. Specifically, "conduct within the United States . . . constitute[d] significant steps in furtherance of the violation" of Rule 10b-5 and Section 17(a). Mr. Scoville conceived and created Traffic Monsoon in the United States. Through Traffic Monsoon, he created and promoted the AdPack investments over the internet while residing in Utah. Indeed, Traffic Monsoon does not dispute in its briefing that "significant steps" in furtherance of the AdPack sales were carried out in the United States. Therefore, Rule 10b-5 and Section 17(a) may be applied to all of the transactions at issue in this case.

### D.  Application of the *Morrison* Transactional Test

There is an alternative reason why Rule 10b-5 and Section 17(a) must be applied to all of the AdPack sales at issue in this case. Even if the court has erred in concluding that Section

929P(b) reinstated the conduct and effects test, all of the AdPack sales challenged by the SEC are domestic transactions under the *Morrison* transactional test.

       1)  Section 10(b) and Rule 10b-5

In *Morrison*, the Supreme Court analyzed the language of Section 10(b), which prohibits manipulative or deceptive devices used "in connection with the purchase or sale of any security," and determined that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 266. Thus, *Morrison* held that Section 10(b) and Rule 10b-5 could only be applied "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 273.

The Second Circuit has noted that "[w]hile *Morrison* holds that § 10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). In analyzing the question of where a transaction occurs, *Absolute Activist* held that the location of the two parties to the transaction at the time that they became irrevocably bound determines the location of the transaction. *Id.* at 68. Thus, a domestic transaction occurs when "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.*

This test for determining when a domestic transaction has occurred comports with the language of Section 10(b), which prohibits the use of manipulative or deceptive devices "in connection with the *purchase or sale* of any security." (Emphasis added). Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of Section 10(b).

In this case, Traffic Monsoon sold all of the AdPacks over the internet to both foreign and domestic purchasers. In all of these transactions, the seller of these securities, a Utah LLC, incurred irrevocable liability in the United States to deliver this security. Thus, all of the transactions satisfy the domestic transaction test under *Morrison* and *Absolute Activist*.[12]

> 2) Section 17(a)

*Morrison* only analyzed the language of Section 10(b) to determine its territorial reach. It had no occasion to consider Section17(a). Because the wording of Section 17(a) is different from Section 10(b), it requires a separate analysis.

While Section 10(b) prohibits certain deceptive practices "in connection with the *purchase or sale of any security*," Section 17(a) forbids deceptive practices "in the *offer or sale of any securities*." (Emphasis added). Section 10(b) employs two terms that denote a completed transaction: "purchase" and "sale." But Section 17(a) regulates not only a completed securities transaction—a "sale"—it also applies to an "offer," which is a primary step to a completed transaction.[13]

---

[12] Traffic Monsoon proffered evidence that Mr. Scoville lived in both the United Kingdom and Utah during the period of time that Traffic Monsoon sold AdPacks over the internet. It argued that Mr. Scoville's physical location at the moment when an AdPack was sold determined the location of the seller for all AdPacks sold. But Mr. Scoville did not sell any AdPacks. His LLC, Traffic Monsoon, did. Mr. Scoville may not claim the advantages afforded by operating through an artificial business entity, only to discard this legal fiction when it suits him. Moreover, Mr. Scoville did not act as an agent of Traffic Monsoon by entering into contracts to sell AdPacks on foreign soil. The exclusive method of purchasing an AdPack was directly from Traffic Monsoon, LLC over the internet. Thus, Mr. Scoville's physical location when a member purchased an AdPack is irrelevant to the question of where the transaction occurred.

[13] Citing several cases from the Southern District of New York, Traffic Monsoon argues that "various courts have similarly recognized that Section 17(a) of the Securities Act of 1933 does not apply to extraterritorial conduct." [Docket 32, p. 8]. *See SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 164 (S.D.N.Y. 2011) ("[T]he Court agrees that *Morrison* applies to Section 17(a) of the Securities Act. At least one post-*Morrison* court in this district has held the Securities Act

Section 17(a), therefore, applies to AdPacks sold to individuals outside the United States for two reasons. As noted above, the sale occurs both in the United States and in the foreign country of the purchaser. In addition, Traffic Monsoon's offer to sell AdPacks over the internet occurred in the United States where Traffic Monsoon, LLC is located.

## II.    PRELIMINARY INJUNCTION

"[U]pon a proper showing," this court may grant the SEC's request for a preliminary injunction restraining acts in violation of either the Securities Act or the Exchange Act. 15 U.S.C. §§ 77t(b), 78u(d). When the SEC seeks a preliminary injunction pending trial, it must show a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be repeated.[14] *SEC v. Unifund SAL*, 910 F.2d 1028, 1031, 1039 (2d Cir. 1990). The degree to which the SEC must prove these two elements depends upon the nature of the injunction that it seeks:

> Though the "clear showing" qualifier appears to have been abandoned for injunctions that serve the traditional purpose of preserving the status quo, plaintiffs have been put to a more rigorous burden in obtaining preliminary injunctions that order some form of mandatory relief. We have said that a "clear showing" is required where the injunction is mandatory. Thus, even when applying the traditional standard of "likelihood of success," a district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the [SEC] is

---

does not apply to 'sales that occur outside the United States.'" (citing *In re Royal Bank of Scotland Grp. PLC Sec. Litig.,* 765 F.Supp.2d 327, 338–39 (S.D.N.Y.2011)). It is true that under *Morrison*, Section 17(a) would also be limited to domestic conduct. But the language of Section 17(a) expands the domestic conduct that is regulated to include both completed transactions and offers to sell securities.

[14] To the extent that the SEC only seeks an asset freeze to guarantee money will be available to remedy a violation, it need not show a reasonable likelihood that the wrong will be repeated. *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) ("An asset freeze requires a lesser showing; the SEC must establish only that it is likely to succeed on the merits."). Because the SEC seeks injunctive relief that exceeds a mere asset freeze in this case, it must also show a likelihood of future violations.

> seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo. Like any litigant, the [SEC] should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.

*Id.* (citations omitted). Under this sliding standard, an injunction that maintains the status quo, such as an asset freeze, can be issued upon a "showing that the probability of [the SEC] prevailing is better than fifty percent." *Id.* at 1039, 1041 (citation omitted); *see also SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). However, a mandatory injunction that alters the status quo or a particularly onerous injunction may be issued only upon a "clear showing" that the SEC will prevail. *Unifund*, 910 F.2d at 1039, 1040–41.

The SEC has requested an injunction that contains elements of both a traditional prohibitory injunction and a more restrictive mandatory injunction. It seeks to maintain the status quo by requesting a freeze on Traffic Monson's assets. But the requested receivership order, which is a necessary component of the preliminary injunction that the SEC's seeks, contains at least one element of mandatory relief: an order that Mr. Scoville "provide any information to the Receiver that the Receiver deems necessary." [Docket 3-5, ¶ 10; Docket 11, ¶ 6].

Moreover, the preliminary injunction that the SEC seeks is particularly burdensome. It would continue the receiver's possession of not just Traffic Monsoon's assets, but also Traffic Monsoon's business operations pending the resolution of this litigation. This interruption in Traffic Monsoon's business, which relies upon a steady stream of new AdPack purchasers to pay revenue sharing to existing AdPack holders, would certainly harm the continuing viability of the enterprise. The keystone to Traffic Monsoon's success has been the cultivation of its members' expectation that the purchase of an AdPack will result in a steady stream of revenues into the

members' accounts. The court is also mindful of the hardship born by the many individuals who have used their savings to purchase AdPacks. The asset freeze denies these individuals access to much needed funds.

Given these considerations, the court requires a clear showing of both a likelihood of success on the merits and that the violations would continue absent an injunction.

**A. Likelihood of Success**

Traffic Monsoon argues that the SEC cannot show a clear likelihood of success in this litigation for several reasons. First, it asserts that its sale of AdPacks does not constitute a Ponzi scheme that would violate Rule 10b-5 or Section 17(a). Second, it argues that the AdPacks are not securities and are therefore not subject to the restrictions contained in Rule 10b-5 or Section 17(a). And third, it argues that the SEC likely cannot prove the scienter requirements of Rule 10b-5 or Section 17(a).

     1)  Existence of a Ponzi Scheme

The Tenth Circuit has defined a Ponzi scheme in several different ways. In *M & L Business Machine* it was defined as:

> an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*Jobin v. McKay* (*In re M & L Bus. Mach. Co.*), 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (quoting *Sender v. Heggland Family Trust* (*In re Hedged-Invs. Assocs., Inc.*), 48 F.3d 470, 471 n.2 (10th Cir. 1995). Alternatively, the circuit court has said that a "Ponzi scheme is a fraudulent investment scheme in which 'profits' to investors are not created by the success of the underlying

business venture but instead are derived from the capital contributions of subsequently attracted investors." *Sender v. Simon*, 84 F.3d 1299, 1301 (10th Cir. 1996). Yet another iteration of the definition of a Ponzi scheme is that it is a

> fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds.

*Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1273 n.2 (10th Cir. 2008) (quoting *Ponzi scheme*, BLACK'S LAW DICTIONARY (8th ed. 2004)). Although there are minor variations, these definitions all agree that the central characteristic of a Ponzi scheme is that returns are not based upon any underlying business activity. Instead, money from new investors is used to pay earlier investors.

Under this definition, Traffic Monsoon operated as a Ponzi scheme. When a member purchased a $50 AdPack, the member obtained a right to share Traffic Monsoon's "revenue" up to $55. The AdPacks typically reached the maximum $55 payout in about 55 days. For many AdPacks, Traffic Monsoon also paid a $5 commission to the referring member. Unbeknownst to the Traffic Monsoon members, though, the revenue sharing returns that flowed into the member's account to obtain the 10% return and 10% commission were derived almost exclusively from the sale of AdPacks to later purchasers. Thus, the profits and commissions generated by the AdPack did not come from underlying business activity. Instead, the profits and commissions were derived from subsequent investments in AdPacks by later purchasers. An AdPack investor was almost completely reliant upon new AdPack purchases to recapture the $50 investment and reap the $5 return. The impressive 66% (or more) annual return obtained by early

34

AdPack investors served as an example that both attracted new investors and convinced existing investors to roll over their AdPack returns into new AdPacks. [15]

But this cycle of returns to early investors fueled by new investments cannot last forever. A 20% payout every 55 days (10% in revenue sharing and a 10% commission) could not be sustained by Traffic Monsoon's relatively anemic revenue generated by selling website visits. Instead, these impressive returns were paid with either new investor money or members rolling over credits in their accounts toward new AdPack purchases. But as the number of outstanding AdPacks expands exponentially, the new investment money must be divided among an ever-growing number of AdPacks, requiring a commensurate exponential expansion of the amount of new investment money just to maintain the same rate of return. At some point, the daily payments deposited in AdPack holders' accounts must begin to decrease until an inevitable

---

[15] One of the unique aspects of Traffic Monsoon that differentiates it from other Ponzi schemes is that members had to continually reinvest in the scheme by rolling over the profit from fully matured AdPacks into the purchase of new AdPacks. This amounted to a shell game in which an initial investment of a sum of money would continually cycle among the members' accounts. A large portion of an initial investment would be distributed to other members as either revenue sharing or a commission. Then the members that received the revenue sharing payments or commissions would reinvest it by rolling it over into new AdPAck purchases. Under this system, the same dollar could be distributed to member accounts as revenue sharing or a commission many times, until either Traffic Monsoon withdrew it as profit or a member withdrew it from his or her account. This explains why the members had a relatively small amount in their accounts when the court entered the TRO—$34.2 million—while the number of outstanding AdPacks, if allowed to mature, would amount to $243.9 million. So long as the members, encouraged by a continual flow of money into their accounts, reinvested most of their money rather than withdrawing it, a relatively small amount of money continually redistributed among the members through revenue sharing could fuel much greater expectations as to the near-future value of the AdPacks. But once the money ceased to continually recycle among the member accounts, as happened when the court entered the TRO, there wasn't enough money to pay what experience had led the members to believe their AdPack investment would be worth after a short 55-day wait. That is why Traffic Monsoon had only about $60 million in assets to cover outstanding AdPacks that would be worth $243.9 million if they had matured, even though member account balances amounted to only $34.2 million.

tipping point is reached where fewer members rollover their AdPacks and fewer new investors are attracted to the scheme. Then, a vicious cycle would begin in which a decrease in new investment would lower the rate of return, which would in turn decrease the amount of new investment even more. This cycle would continue until the system collapsed and the unlucky individuals who had not pulled out their money in time would be left with next to nothing. *See Merrill v. Abbott* (*In re Indep. Clearing House Co*.), 77 B.R. 843, 860 (Bankr. D. Utah 1987) ("A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry.").

A Ponzi scheme is inherently deceptive because it generates a false appearance of profitability by using money from new investors to generate returns for earlier investors. *Mukamal v. General Electric Capital Corp.* (*In re Palm Beach Fin. Partners, L.P.*), 517 B.R. 310, 346 (Bankr. S.D. Fla. 2013) ("[T]he hallmark of a Ponzi scheme, which is inherently fraudulent in nature, is 'that the entity gives the false appearance of profitability by seeking investments from new sources rather than earning profits from assets already invested.'" (citation omitted)). These artificial returns mislead new investors and conceal the fact that the Ponzi will inevitably collapse and investors will lose money. Therefore the operator of a Ponzi scheme will likely violate the prohibitions against employing "any device, scheme, or artifice to defraud" or engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit" contained in Rule 10b-5(a), (c) and Section 17(a)(1), (3). *See SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *13–*14 (W.D. Tex. Aug. 21, 2015) (concluding that a Ponzi scheme was a "scheme to defraud" under Rule 10b-5 and Section 17(a)); *Merrill*, 77 B.R. at 860 (The perpetrator of a Ponzi scheme "must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.").

Traffic Monsoon argues that it cannot be liable under Rule 10b-5 or Section 17(a) because it did not operate a Ponzi scheme. First, it points to the fact that its website does not promise any particular rate of return for AdPack purchases and specifically notifies members that reaching the maximum $55 payout is not guaranteed. Quoting language from *M & L Business Machines*, Traffic Monsoon notes that "[t]ypically, investors [in a Ponzi scheme] are promised large returns for their investments." 84 F.3d at 1332 n.1. But although promised returns may be a "typical" indicator of a Ponzi scheme, it is not a necessary element of such a scheme. What is required is the payment of returns to existing investors with new investor money. As evidenced by the rapid expansion of Traffic Monsoon's AdPack sales, the false appearance of profitability afforded by this practice was more than sufficient to entice new investors.

The deception at the heart of the Traffic Monsoon Ponzi scheme is that it concealed the fact that almost all of the returns from the AdPacks were derived from subsequent AdPack purchases. The website did not notify its members that over 98% of the returns came from subsequent investments in AdPacks. By calling the returns "revenue sharing," and falsely claiming that the sale of AdPacks did not constitute a Ponzi scheme, Traffic Monsoon suggested that the returns were generated by business revenue rather than by other investments in AdPacks. Indeed, the website asserted that "[n]ew sales of advertising service generate new earnings" and that "[i]t's from the sale of all our services that we share revenues," misleading the members as to the source of the AdPack returns.

Traffic Monsoon also asserts that it does not operate a Ponzi scheme because it has sufficient funds to pay out all of the money in its members' accounts. According to Traffic Monsoon, if its business model collapses and no more AdPacks are sold, it will have broken no promises because it will be able to pay out all of the money it is contractually obliged to remit.

37

But breaching a contract is not the hallmark of a Ponzi scheme. Its defining characteristic is the inherently deceptive practice of using new investor money, rather than revenue derived from an underlying business, to pay returns to existing investors.

It is true that Traffic Monsoon's sale of AdPacks differs somewhat from a run-of-the-mill Ponzi scheme. In most Ponzi schemes, an investor who deposits $1,000 in the scheme will be told that there is $1,000 in his or her account, and this total will be augmented with fictitious returns. This iteration of a Ponzi scheme is inherently bankrupt because there isn't enough money to pay out the fictitious sums in all of the victim's accounts. In the case of Traffic Monsoon, however, if a member purchased $1,000 in AdPacks, that money would immediately be distributed to the referring member, to other qualified AdPack holders, and to Traffic Monsoon. The purchasing member's account would initially have zero dollars in it. Then money that other investors used to purchase AdPacks would flow into the member's account until it reached $1,100 about two months later. What made Traffic Monsoon a successful Ponzi scheme, however, was that members would not allow large amounts of money to accumulate in their accounts. They would continually reinvest this money by purchasing additional AdPacks, leaving Traffic Monsoon with a relatively modest obligation to pay out money contained in the member accounts. But the fact that Traffic Monsoon might have enough money to pay out the money contained in the member accounts if the AdPack model were allowed to collapse under its own weight does not mean that it does not operate a Ponzi scheme. Members would still have been deceptively enticed to invest their savings in the scheme by the illusion of profitability Traffic Monsoon cultivated by using new investor money to pay returns to earlier investors. And those members that would be left holding hundreds or thousands of worthless AdPacks would still have lost their savings.

38

Finally, Traffic Monsoon suggests that it does not operate a Ponzi Scheme because it operates a legitimate advertising business. However, "[t]he fact that an investment scheme may have some legitimate business operations is not determinative. If the [defendant's] legitimate business operations cannot fund the promised returns to investors, and the payments to investors are funded by newly attracted investors, then the [defendant] is operating a Ponzi scheme." *In re Twin Peaks Fin. Serv's Inc.,* 516 B.R. 651, 655 (Bankr. D. Utah 2014); *accord Miller v. Wulf*, 84 F. Supp. 3d 1266, 1272 (D. Utah 2015) ("'[S]eemingly legitimate business activity does not insulate companies from a finding that they were operated as part of a Ponzi scheme.' Ponzi schemes sometimes use legitimate operations to attract investors, but the existence of that legitimate business does not preclude a finding that the company operated a Ponzi scheme." (alteration in original) (footnote and citation omitted)). The less than 2% of revenue Traffic Monsoon collected from the sale of website visits was clearly insufficient to fund the AdPacks' aggressive returns.

### 2) AdPacks are securities

Both Rule 10b-5 and Section 17(a) regulate transactions that involve securities. The SEC argues that the AdPacks are securities because they amount to an investment contract, which was defined by the U.S. Supreme Court in the seminal *Howey* opinion as comprising three elements. They are: "[1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). In applying this definition of an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

Traffic Monsoon argues that its sale of AdPacks did not create an investment contract and, therefore, the AdPacks are not securities. First, Traffic Monsoon argues that its sale of an

AdPack does not constitute "an investment of money in a common enterprise," but rather the purchase of services. The fact that members received some services for their AdPack purchases, however, does not mean that the AdPack was not an investment. The same services available through the AdPack could be purchased à la carte for just $10.95. The only explanation for why members would pay an additional $39.05 for the same services was that they wanted to invest their money to obtain the generous returns obtained by early investors. The evidence clearly points to the fact that Traffic Monsoon's explosive growth was driven by members purchasing and repurchasing AdPacks in order to obtain the incredible returns on their investment, not by intense demand for Traffic Monsoon's services. Indeed, many AdPack purchasers had no interest in the website visits Traffic Monsoon offered, and Traffic Monsoon only ever delivered a fraction of the clicks it promised to deliver. In short, the economic reality of the AdPack purchases is that they were investments.

Second, Traffic Monsoon contends that the profits from the AdPacks did not "come solely from the efforts of others" because its members were required to invest a little over four minutes every day to visit 50 websites for five seconds each. It asserts that this requirement to qualify for revenue sharing constituted efforts on the part of the members to reap the profits from the AdPacks.

This argument is unavailing. "[T]he word 'solely' used in the Howey test 'should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities.'" *Crowley v. Montgomery Ward & Co.*, 570 F.2d 877, 879 (10th Cir. 1978) (citation omitted). "Investments satisfy the third prong of the *Howey* test 'when the efforts made by those other than the investor are the ones which affect significantly the success

or failure of the enterprise.'" *SEC v. Shields*, 744 F.3d 633, 645 (10th Cir. 2014) (citation omitted). "[T]he test is 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Crowley v. Montgomery Ward & Co.,* 570 F.2d 875, 877 (10th Cir. 1975) (citation omitted)). In this case, the efforts of the members in visiting websites for about four minutes a day was not a significant contribution to the success or failure of the AdPack scheme. Over 98% of Traffic Monsoon's revenue sharing came from the sale of AdPacks. The success of AdPack sales had nothing to do with the members' efforts and depended solely on Mr. Scoville's acumen in promoting them.

Because the three elements of the *Howey* test are satisfied, the AdPacks were securities subject to regulation under Rule 10b-5 and Section 17(a).

3)   Scienter

Traffic Monsoon also argues that the SEC cannot prove the scienter element of Rule 10b-5 or Section 17(a). As evidence for this proposition, it states that in early 2014, the Utah Division of Securities investigated a scheme similar to Traffic Monsoon run by Mr. Scoville called AdHitProfits. When Mr. Scoville inquired as to the status of that investigation, he received an email stating that the matter has been closed because "a security was not involved." Traffic Monsoon cites this email as persuasive evidence that Mr. Scoville lacked scienter because he did not know that the AdPacks were securities.

This argument is unavailing for several reasons. First, Traffic Monsoon provides no authority for the proposition that the SEC is required to prove that Mr. Scoville knew that the AdPacks meet the definition of a security. Second, to the extent that Traffic Monsoon argues that the SEC cannot prove that Mr. Scoville had the requisite knowledge that the AdPacks were a

"device, scheme, or artifice to defraud" or a "course of business which operates or would operate as a fraud or deceit" under Rule 10b-5 or Section 17(a), the operation of a Ponzi scheme itself is evidence of scienter. The perpetrator of a Ponzi scheme "must know all along, from the very nature of his activities, that investors at the end of the line will lose their money." *Merrill*, 77 B.R. at 860. And third, Section 17(a)(3) does not have a scienter requirement. *Aaron v. SEC*, 446 U.S. 680, 696 (1980). At minimum, Traffic Monsoon's scienter argument is unavailing as to this claim.

    4)  Conclusion

In sum, all of Traffic Monsoon's arguments as to why it will win this case are without merit. Reviewing the evidence, the court concludes the SEC has made a clear showing that it will likely prevail on the merits.

### B. Reasonable Likelihood that the Wrong Will Be Repeated

In the Tenth Circuit, courts examine several factors to evaluate the likelihood that the wrong will be repeated:

> Determination of the likelihood of future violations requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations. . . . A knowing violation of §§ 10(b) or 17(a)(1) will justify an injunction more readily than a negligent violation of § 17(a)(2) or (3). However, if there is a sufficient showing that the violation is likely to recur, an injunction may be justified even for a negligent violation of § 17(a)(2) or (3).

*SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).

Mr. Scoville does not argue that the likelihood of future violations prong of the preliminary injunction test has not been met. He sold AdPacks through Traffic Monsoon from

October, 2014 up until the day that this court entered a TRO enjoining this practice in July, 2016. Mr. Scoville has provided no assurances that he will discontinue the sale of AdPacks if the TRO is permitted to expire. Instead, his entire defense has been that his sale of AdPacks was a legitimate and legal business practice. Moreover, the very nature of a Ponzi scheme is that it must be perpetuated through the solicitation of additional investments or it will collapse.

The court concludes that, absent a preliminary injunction, the SEC has made a clear showing that Mr. Scoville will continue to violate securities laws by perpetuating a Ponzi scheme. Moreover, to the extent that the SEC seeks an asset freeze, proof of a likelihood of future violations is not required. *Cavanagh*, 155 F.3d at 132.

### C. Conclusion

The SEC has made a clear showing that it will prevail and that Mr. Scoville will continue to violate the law by operating a Ponzi scheme absent an injunction. The court therefore grants the SEC's request for a preliminary injunction.

## III.   OBJECTIONS TO THE RECEIVERSHIP ORDER

In his motion to set aside the receivership, Mr. Scoville argues that the present receivership order violates his Fourth and Fifth Amendment rights. The court need not determine whether the current receivership order violates these rights because the court exercises its discretion to amend the receivership order to address his concerns.

Without citing authority, Mr. Scoville also argues that the receivership order violates his right to due process because it deprives him of funds to mount a legal defense to the SEC's claims. But "a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *SEC v. Marino*, 29 F. App'x 538, 541–42 (10th Cir. 2002) (unpublished) (quoting *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993)). Indeed, in a

criminal prosecution, "[a] robbery suspect . . . has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). If a criminal defendant may not use ill-gotten gains to fund a defense, a civil defendant certainly may not.

Because the court concludes that the SEC has demonstrated a strong likelihood that it will prove that Mr. Scoville operated an illegal Ponzi scheme, it denies his due process objection to the receivership order.

## IV.  SECTION 1292(b) CERTIFICATION

The court certifies this order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This order contains several "controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."

There is "substantial ground for difference of opinion" as to whether Section 929P(b) of Dodd-Frank reinstated the conduct and effects test for litigation brought by the SEC. Although several district courts have noted the possibility that Section 929P9(b) may have superseded the *Morrison* test, none have actually decided the question. *See SEC v. Battoo*, 158 F. Supp. 3d 676, 692 (N.D. Ill. 2016); *SEC v. Brown*, No. 14 C 6130, 2015 WL 1010510, at *5 (N.D. Ill. Mar. 4, 2015) (unpublished); *SEC v. Chicago Convention Ctr., LLC*, 961 F. Supp. 2d 905, 916–17 (N.D. Ill. 2013). Alternatively, there are grounds for a difference of opinion as to whether Traffic Monsoon's sale of AdPacks to foreign customers constituted a domestic transaction if the *Morrison* test still applies to litigation brought by the SEC. And finally, the issue of whether Traffic Monsoon's particular business model constitutes a Ponzi scheme in light of the contingent nature of the promised returns appears to be an issue of first impression in this circuit.

44

## CONCLUSION

Traffic Monsoon's motion to set aside the receivership [Docket 33] is DENIED. The SEC's request for a preliminary injunction is GRANTED. The court shall issue a separate preliminary injunction order and a revised receivership order.


Signed March 28, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge