Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Court-Appointed Receiver, Peggy Hunt*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                  Plaintiff.<br><br>v.<br><br>TRAFFIC MONSOON, LLC, a Utah Limited Liability Company, and CHARLES DAVID SCOVILLE, an individual,<br><br>                  Defendants. | **RECEIVER'S SECOND STATUS REPORT** *(APRIL 1, 2017 THROUGH JUNE 30, 2017)*<br><br>2:16-cv-00832-JNP<br><br>The Honorable Jill N. Parrish |

## TABLE OF CONTENTS

**Page**

I.    Introduction ....................................................................................................1

II.    Summary of Key Events ..................................................................................1

        A.    Commencement of the Civil Enforcement Case and the TRO .................................1

        B.    Appointment of the Receiver and Employment of Professionals ...........................2

        C.    The Preliminary Injunction ........................................................................3

III.    Work Done By The Receiver And Her Professionals During The Reporting Period ..........................................................................................................4

        A.    Recreating Business Records .......................................................................4

        B.    Investor Communications ..........................................................................9

        C.    Snoork Issues .......................................................................................11

        D.    Work on the Tenth Circuit Appeal ...............................................................12

        E.    Administration of Real and Personal Property ................................................12

        F.    General Administration .............................................................................13

IV.    Financial Report ...........................................................................................14

        A.    Receivership Bank Accounts and Funds ........................................................14

        B.    Standardized Fund Accounting Reports ("SFARs") ..........................................15

        C.    Administrative Expenses ...........................................................................15

V.    Conclusion ..................................................................................................16

Peggy Hunt, the Court-appointed Receiver (the "Receiver") for Traffic Monsoon, LLC and the assets of Charles David Scoville that were obtained directly or indirectly from Traffic Monsoon, hereby submits this *Second Status Report* for the period of April 1, 2017 through June 30, 2017 (the "Reporting Period"). This Report is being posted on the Receiver's website at www.trafficmonsoonreceivership.com.

## I.   Introduction

This Status Report includes a brief summary of key events in the case to date as set forth in Part II below. For a more detailed discussion about the background in this case, please see the *Receiver's First Status Report (July 26, 2016 Through March 31, 2017)* (the "First Status Report").[1] Part III of the Status Report is a summary of the Receiver's work during the Reporting Period. Part IV provides a financial summary.

All of the documents filed with the Court that are referenced in this Status Report are posted on the Receiver's website at www.trafficmonsoonreceivership.com.

## II.   Summary of Key Events

### A.   *Commencement of the Civil Enforcement Case and the TRO*

On July 26, 2016, the above-captioned case was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Traffic Monsoon, LLC ("Traffic Monsoon") and Charles David Scoville ("Scoville" and together with Traffic Monsoon, the "Defendants"). The SEC claims, among other things, that between October 2014 and July 26, 2016, the Defendants engaged in securities fraud and operated a Ponzi scheme. It is alleged

---

[1] Docket No. 91. The First Status Report incorporated the *Declaration of Receiver Peggy Hunt (Communications)* (the "Communications Declaration"), Docket No. 54; and the *Declaration of Peggy Hunt (Business Operations)* (the "Business Operations Declaration"), Docket No. 55.

1

that the Defendants took approximately $207 million from over 162,000 investors primarily through the solicitation of an investment known as an "AdPack."[2]

At the time that the case was commenced, the United States District Court (the "Court") entered a *Temporary Restraining Order and Order Freezing Assets*, which, prior to the entry of the Preliminary Injunction discussed below, was amended by Orders entered on July 27, 2016 and on November 4, 2016 (collectively, the "TRO").[3]  The TRO, among other things, prohibited the Defendants from operating and imposed an asset freeze of the Defendants' assets.

B.    *Appointment of the Receiver and Employment of Professionals*

On July 27, 2016, just after the entry of the TRO, the Court entered an *Order Appointing Receiver* (the "Receivership Order"),[4]  thus commencing the receivership.  Ms. Hunt was appointed as the receiver of Traffic Monsoon and the assets of Scoville pending a determination as to whether a preliminary injunction should be entered in the case.  Ms. Hunt is an attorney whose primary area of practice over the last 26 years has focused on bankruptcy (both liquidation and reorganization), insolvency and receivership law.  She serves as a trustee in bankruptcy cases filed in the District of Utah, and regularly represents trustees and equity receivers appointed in cases involving Ponzi schemes and other types of securities fraud.

The Receiver immediately took control of known assets and commenced an investigation.  This investigation which is discussed in further detail in the First Status Report and below is ongoing.  To assist with the investigation and the discharge of her duties, the Receiver obtained

---

[2] *See* Docket No. 2 (Complaint ¶ 2).

[3] Docket Nos. 8, 14 & 56.

[4] Docket No. 11.

Court approval to employ Dorsey & Whitney LLP ("Dorsey") as her legal counsel, and Berkley Research Group ("BRG") as her forensic and general accounts.[5] The Receiver also contracted with a company called "Epiq" primarily to assist her with securing electronic data on Traffic Monsoon's servers and in managing investor communications.

      C.    *The Preliminary Injunction*

The SEC requested that the Court enter a preliminary injunction against Scoville and Traffic Monsoon. This request was contested by Scoville, and Scoville also filed a *Motion to Set Aside Receivership*.[6] On March 28, 2017,[7] after concluding a contested evidentiary hearing, the Court entered a *Preliminary Injunction* and an *Amended Order Appointing Receiver* ("Amended Receivership Order").[8] As a result, Scoville's objections to the SEC's request for the entry of a preliminary injunction were overruled, and Scoville's request to set aside the receivership was denied. Thus, Ms. Hunt has continued to serve as receiver.

While the exact terms of the "Preliminary Injunction" should be reviewed, the Court generally prohibits Scoville from operating Traffic Monsoon "or a business model substantially similar to Traffic Monsoon's sale of AdPacks."[9] The Court also imposes an asset freeze of all

---

[5] Docket Nos. 11 & 25 (Orders authorizing employment).

[6] Docket Nos. 32, 33, 45; *see also* Docket Nos. 38, 39, 48, 49, 53 (SEC response).

[7] Before the Court ruled on matters under advisement, Scoville filed a *Motion to Dismiss*, which is based substantially on the same arguments made in conjunction with his opposition to the entry of a preliminary injunction. Docket No. 70. Scoville has agreed that the SEC does not need to file a response to his Motion to Dismiss at this time. Docket Nos. 73-74 and 89.

[8] Docket Nos. 79 – 80. See Docket No. 91 (First Status Report, at 3 (summary of the preliminary injunction hearing).

[9] Docket No. 80 (Preliminary Injunction, p. 1).

"assets, of whatever kind and wherever situated, of Traffic Monsoon, LLC and Charles D. Scoville that were obtained directly or indirectly from Traffic Monsoon, LLC. . . ."[10]  And, the Court has ordered a stay of all litigation in any court against either or both of the Defendants.[11] In conjunction with the Preliminary Injunction, the Court entered a *Memorandum Decision and Order*,[12] which includes significant factual findings and a comprehensive legal analysis.  While the findings are summarized in part in the Receiver's First Status Report, important to note is that the Court concluded that a clear showing had been made that the SEC was likely to succeed in establishing that Traffic Monsoon was a Ponzi scheme.

During the Reporting Period, Scoville appealed the Amended Receivership Order and Preliminary Injunction, and this appeal is currently pending before the United States Court of Appeals for the Tenth Circuit.

**III.    Work Done By The Receiver And Her Professionals During The Reporting Period**

A.    *Recreating Business Records*

The primary focus of the Receiver's work during this Reporting Period has been in recreating Traffic Monsoon's business records.  This work is vital to allow the Receiver to determine the identity of investors, those investors with claims and the amounts of their claims, and to determine if the Receivership Estate has claims that would be beneficial to pursue. Significant progress has been made in recreating the records during the Reporting Period, but as discussed below, this is an ongoing task.

---

[10] Docket No. 80 (Preliminary Injunction, p. 2).

[11] Docket No. 80 (Preliminary Injunction, p. 3).

[12] Docket No. 79.

As discussed in the First Status Report, Scoville did not maintain independent accounting records for Traffic Monsoon. Thus, identifying investors and claims can be determined only by analyzing transaction records located on the imaged copies of Traffic Monsoon's servers – defined as the "TM Data", and information obtained by the Receiver from the following third party entities that processed investor payments to and from Traffic Monsoon: Paypal; Payza; Solid Trust Pay ("STP"); Allied Wallet; and Chase (collectively, the "Financial Entities").[13] As described in the First Status Report, this process involves the time-consuming tasks of identifying and analyzing very voluminous electronic data.  These tasks are complicated by numerous factors.

The TM Data extracted from Traffic Monsoon's servers consists of over 500 million individual records or entries, maintained in approximately 150 different data tables.  Using the TM Data, BRG has been creating a working database, separate from the image of the data captured by the Receiver from Traffic Monsoon's servers near the time of her appointment, to assist the Receiver in her duties.  This task has taken a significant amount of time given the lack of traditional financial and accounting records and the massive volume of transactional and database activity.  Additionally, BRG has encountered challenges as a result of, among other things, the lack information related to the structure and function of the website code and related MySQL data tables; the complexity of the website code; the number of investors and their varied geographical locations; missing or inaccurate transaction referencing in TM Data; and incomplete data provided from the various Financial Entities.

---

[13] *See* Docket No. 91 (First Status Report, at 21-22 (discussing Defendant Accounts)).

Furthermore, to provide a complete picture of Traffic Monsoon's financial records, including the identity of investors and claims, the TM Data must be compared, validated, and in some instances, supplemented by information obtained from the Financial Entities. The Receiver has worked with her professionals to obtain the Financial Entities' Traffic Monsoon-related records both through subpoena and informal information sharing. Yet, this task involves significant communication and follow-up given the sheer volume of Financial Entities' Traffic Monsoon-related transaction activity and the transactional differences between the TM Data and Financial Entities' records. Thus, obtaining this third party information, deciphering it, and analyzing it is an ongoing task. To date, the status of information collected from the Financial Entities is as follows:

- *PayPal*: Traffic Monsoon electronic payment processor data from PayPal's website portal includes over 5.5 million records. The PayPal records are currently being categorized by transaction type (*i.e.* investor contributions, disbursements to investor, operating expenses, etc.). Furthermore, BRG is identifying and adding relevant Traffic Monsoon member identifiers to transactions, comparing transactions to the TM Data, and assigning country/jurisdiction codes to assist in identifying the location of investors. BRG also is working with PayPal to obtain additional information and data to assist with further categorization of transactions due to significant incomplete and null TM Data.

- *Payza*: Traffic Monsoon electronic payment processor data from Payza includes over 191,000 records for the "TM-US" account, and over 385,000 records for the

6

"TM-UK" account.[14]  BRG has worked with Payza during the Reporting Period to understand and categorize the transaction data obtained from Payza to date. As part of its analysis, BRG identified certain issues with the data received from Payza, and BRG has made inquiries and requested additional data. BRG is in the process of completing its categorization process of the Payza data it has, and is awaiting response to its inquiries and/or requests in order to finalize this task.

- *STP*:  Traffic Monsoon electronic payment processor data from STP to date includes over 110,000 records.  BRG has worked with STP to understand and categorize the transaction data obtained from STP to date.  As with Payza, this task is ongoing because of the issues that BRG identified with the STP data.  BRG is in the process of completing its categorization process of the STP data it has, and is awaiting receipt of updated data in order to finalize this task.

- *Allied Wallet*:  Traffic Monsoon electronic payment processor data from Allied Wallet to date includes over 100,800 records.  BRG has worked with Allied Wallet to analyze the transaction data obtained to date. The progress with Allied Wallet is similar to the issues encountered with Payza and STP.

- *Chase*: Transaction activity recorded in the three Chase accounts includes nearly 4,900 transactions, involving $61,655,082 in receipts and $61,629,361 in disbursements.  BRG has worked with Chase to analyze the transaction data obtained to date. As part of its analysis, BRG identified additional supporting transaction documents that would assist in its investigation. These documents

---

[14] *See* Docket No. 91 (First Status Report, at 21 (discussing Defendant Accounts)).

7

have been requested from Chase.  BRG is in the process of completing its

categorization process of the Chase data, but is awaiting receipt of the additional

documentation in order to finalize its analysis.

Finally, as discussed in Part III(B) below, Dorsey has continued to collect information

provided from Traffic Monsoon investors, and this information is being shared with BRG as a

further point of reference for compiling Traffic Monsoon's records.  The Receiver has

determined, at least at this point, that it will not be efficient or beneficial to have investors submit

written proof of claims due to, among other things, the number of investors, their varied

locations, and the fact that Traffic Monsoon did not keep reliable contact information.  Rather,

the Receiver is anticipating using the recreated records to recommend procedures to the Court for

the allowance of claims.  Accordingly, at this time, the Receiver has not formally requested

information from investors.  She is considering providing a portal on the Receivership Website

that will allow investors to provide information in a controlled manner that, hopefully, will result

in an accurate collection of their information.  This information, to the extent provided by the

thousands of investors, may be used in conjunction with the records discussed above in

recreating Traffic Monsoon's records.

While significant progress in recreating Traffic Monsoon's records has been made during

the Reporting Period, given the issues discussed above, the Receiver anticipates that it will take

additional time to finalize this preliminary and necessary task.  She understands that making a

distribution to those holding claims is of paramount importance, and she and her team are

diligently working collectively to move this case to the next step of recommending claim

amounts and, ultimately, proposing a plan of distribution.

B.     *Investor Communications*

The Receiver and Dorsey have spent considerable time communicating with investors during the Reporting Period.  A detailed summary of efforts in this regard through October 2016 is included in the Receiver's Communications Declaration.  Below is general summary and updated information.

Just prior to and immediately upon being appointed, the Receiver set up procedures at her law office for handling, responding to and tracking of investor phone calls, emails and all other written communications made to the Receiver at her office and through the Receivership Email Address (defined below).  Two Dorsey employees have been tasked with managing these tasks for the Receiver, and this work is ongoing.

The Receiver and Dorsey also worked with Epiq to set up the "Receivership Website" at www.trafficmonsoonreceivership.com; and a "Call Center" to receive telephone calls, including providing translation services.  The Receivership Website includes, among other things, (a) information about how to contact the Receiver, including a designated an email address at trafficmonsoon.receiver.inquiries@dorsey.com ("Receiver Email Address") and telephone numbers for the Call Center; (b) updates about matters occurring in the SEC's case and matters being handled by the Receiver; and (c) a posting of key documents filed in the case.  Investor inquires made through the Receiver Email Address are handled by Dorsey employees with information provided to them by the Receiver.  Information provided to the Receiver through emails to the Receiver Email Address is being collected by the Receiver and, as discussed above, being provided to BRG to assist in the recreation of Traffic Monsoon's business records.

The Call Center is manned by Epiq with persons who are trained to obtain certain information from persons calling in, on how to answer the typical questions asked based on instructions provided by the Receiver, and on how to relay information about the Receivership Website. Epiq provides weekly reports to the Receiver on summarizing the calls received and, if necessary, the Receiver communicates with Epiq about how to resolve certain inquiries. During the Reporting Period, the Receiver has provided updated information to Epiq to be used at the Call Center.

The Receiver also has been given access to Traffic Monsoon's PayPal accounts. BRG is using this access to assist it in recreating and analyzing Traffic Monsoon's financial records. Additionally, Dorsey has used this access to respond to numerous "chargeback" requests made by investors in an attempt to ensure that all investors are treated in a fair manner with respect to their claims against the Receivership Estate.[15]

Finally, during the Reporting Period, the Receiver has been contacted by several groups of investors in various contexts, including counsel in a proposed class of investors who claim to have used PayPal for their Traffic Monsoon investments, and a group of investors who claim that their money was invested with Traffic Monsoon through a person who is now involved in a security enforcement action outside of the United States. In the case of the PayPal class, the Receiver and her counsel have spent time during the Reporting Period evaluating the potential interests of the Receivership Estate. In all instances, the Receiver has worked with those who have contacted her to, among other things, gather information as part of her investigation.

---

[15] Docket No. 91 (First Status Report, at 12 (discussing chargeback issues)).

C.   *Snoork Issues*

As discussed in the First Status Report, prior to the filing of this case Traffic Monsoon leased from Snoork LLC ("Snoork") thirteen servers located in Atlanta, Georgia and Los Angeles, California.[16]  The Receiver, through Epiq, secured the servers and obtained a forensic image of the servers.  This image is being maintained by Epiq for the Receiver, and has been important in BRG's work to recreate Traffic Monsoon's financial records.

Snoork's monthly hosting fee for the servers was $11,884.86.  After an image of the servers was obtained, the Receiver attempted to negotiate a reduced monthly hosting fee with Snoork, but was unable to do so.  The Receiver determined that she could not simply abandon the servers because the information on them, which includes investor identifying data, needed to remain secure.  The Receiver thus determined that she would need to erase the information on the servers and turn them back to Snoork.  On February 24, 2017, the Receiver filed a *Motion Seeking Authorization (1) to Terminate Month-To-Month Services of Snoork LLC; and (2) to Pay Snoork LLC*,[17] requesting authority to, among other things, erase the servers and pay Snoork its outstanding invoices (but not late fees).  Scoville objected to this motion,[18] but during the Reporting Period the Court entered an *Order* overruling Scoville's objection and granting the relief sought by the Receiver.[19]  Thereafter, the Receiver and Epiq worked to determine the most efficient way to erase the servers of all Traffic Monsoon data so that they could be turned over to

---

[16] Docket No. 91 (First Status Report, at 24), incorporating Receiver's Business Operations Declaration).

[17] Docket No. 75.

[18] Docket No. 77.

[19] Docket No. 83.

11

Snoork, and worked with Snoork to arrange payment and access to the servers for erasure. Snoork was paid a total of $89,928.79, and Epiq has certified that the data on all servers used by Traffic Monsoon have been erased. Accordingly, the Receivership Estate has secured Traffic Monsoon's data, the clean servers have been turned over to Snoork, and the Receivership Estate will no longer have costs associated with the Snoork servers.

       D.     *Work on the Tenth Circuit Appeal*

As noted in Part II above, Scoville filed a Notice of Appeal with the Tenth Circuit Court of Appeals, appealing the Court's Preliminary Injunction and Amended Receivership Order. In the Notice of Appeal, Scoville stated that both he personally and Traffic Monsoon are appellants. The Receiver and Dorsey have spent time during the Reporting Period attending to the incorrect naming of Traffic Monsoon as an appellant inasmuch as Scoville does not have authority to act on behalf of Traffic Monsoon. The Receiver, who does have authority to act on behalf of Traffic Monsoon, did not authorize the appeal. It is anticipated that a stipulation regarding this issue will be filed in the appellate case in the next Reporting Period.

       E.     *Administration of Real and Personal Property*

A summary of real and personal property identified by the Receiver to date is included in the First Status Report, and that Report should be consulted to understand the scope of assets known at this time.[20] Below is a summary of actions the Receiver has taken with regard to real and personal property during the Reporting Period.

       1.     Manchester Flat. In August 2015, Scoville purchased a flat located in Manchester, UK (the "Manchester Flat"). The Receiver believes that the Manchester Flat was

---

[20] Docket No. 91 (First Status Report, at 12-14).

purchased with monies from Traffic Monsoon and, therefore, it is property of the Receivership Estate. The Receiver has obtained the keys for the Manchester Flat, and during the Reporting Period, the Receiver has attended to issues in maintaining this asset, including the payment of homeowner's fees.

> 2. <u>Vehicles</u>. The Receiver has only identified a 2013 Nissan titled in Scoville's name. This vehicle was purchased prior to the formation of Traffic Monsoon and, accordingly, the Receiver prepared and filed with the Court a *Notice of Abandonment of Personal Property (Vehicle)*[21] during the Reporting Period.

> F. *General Administration*

During the Reporting Period, the Receiver, her counsel and BRG have attended to numerous matters related to the administration of the Receivership Estate. These tasks have included but are not limited to monitoring and managing bank accounts and following accounting protocols; preparing SFARs (as defined below); evaluating and paying costs related to administration; attending to mail;[22] evaluating issues related to compliance with applicable tax laws; filing papers required by applicable tax laws; communicating with investors and interfacing with financial account institutions; and coordinating with governmental entities as requested.

---

[21] Docket No. <u>92</u>.

[22] Shortly after her appointment, the Receiver redirected mail for the Defendants to her office. Since the entry of the Preliminary Injunction, the Receiver has informed Scoville through his counsel that she will forward his personal mail to him when it is received by her, and she has done so during the Reporting Period.

The Receiver also filed a *Motion to Establish Administrative Expense Procedures*,[23] requesting Court approval of procedures for payment of professionals employed in this case to aid in the administration of the Receivership Estate.  The Court requested additional information related to this Motion,[24] which was provided in a *Response* that was prepared and filed with the Court.[25] On June 13, 2017, the Court entered an *Order Granting in Part and Denying in Part Motion to Establish Administrative Procedures for the Payment of Receivership Expenses*,[26] in which the Court adopted many of the Receiver's proposed procedures, but not all.  In light of the fact that this Order was entered in mid-June, close to the close of the calendar quarter, the Receiver and her professionals intend to file a *Second Interim Fee Application* with the Court for this Reporting Period that closed at the end of June 2017, and commence use of the interim payment procedures approved by the Court starting with invoices for services rendered in July 2017.

## IV.      **Financial Report**

### A.      *Receivership Bank Accounts and Funds*

The Receiver currently has a funded "Operating Account" which does not earn interest, and a funded "Money Market Account" which earns interest.  As of the date of the end of the Reporting Period, the Operating Account had a balance of $98,586.90, and the Money Market Account had a balance of $48,593,011.34.

---

[23] Docket No. 94.

[24] *See* Docket No. 98 (Order).

[25] Docket No. 99.

[26] Docket No. 101.

B.    _Standardized Fund Accounting Reports ("SFARs")_

Deposits and withdrawals from both accounts and a reporting of the assets of the Receivership Estate are set forth SFARs that are prepared quarterly by BRG at the Receiver's direction. The SFAR for the Reporting Period is attached hereto as **Exhibit A**. As set forth in the current SFAR, the Receivership Estate earned interest income in the total amount of $30,558.91, and the disbursements made were to pay professionals allowed fees and expenses as discussed below, and to pay Snoork for server hosting services as discussed above.

C.    _Administrative Expenses_

The fees and out of pocket expenses of the Receiver, Dorsey and BRG must be approved by the Court prior to payment. During the Reporting Period, the Receiver prepared and filed with the Court a _First Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered From July 27, 2016 Through March 31, 2017._[27] On June 7, 2017, the Court entered an _Order_ approving that Application and allowing the fees and expenses requested by the Receiver, Dorsey and BRG.[28] The Receiver thus has paid the following in accordance with the Order: (i) the Receiver was paid a total of $139,747.05 in allowed fees; (ii) Dorsey was paid a total of $350,984.23 in allowed fees and expenses; and (iii) BRG was paid a total of $351,735.75 in allowed fees and expenses.

During the current Reporting Period, the Receiver has worked a total of 90 hours providing receivership services to the Receivership Estate for which fees in the total amount of $28,937.70 have been incurred after voluntary reductions. Dorsey has worked a total of 155.50

---

[27] Docket No. 93.

[28] Docket No. 100.

hours and provided legal services to the Receivership Estate for which fees in the total amount of $43,234.50 and out-of-pocket expenses in the total amount of $525.55 have been incurred after voluntary reductions. And, BRG has worked a total of 371.0 hours providing forensic and general accounting services to the Receivership Estate for which fees in the total amount of $96,740.00 and out-of-pocket expenses in the total amount of $51.33 have been incurred after voluntary reductions.

As noted above, the Receiver intends to file a Second Interim Fee Application for this Reporting Period shortly after the filing of this Status Report.

## V.   Conclusion

This is a complicated case which has been complicated further, in large part, by the Defendants' failure to maintain business records. While significant progress in recreating Traffic Monsoon's records has been made during the Reporting Period, given the issues discussed above, the Receiver anticipates that it will take additional time to finalize this preliminary and necessary task. She understands that making a distribution to those holding claims is of paramount importance, and she and her team are diligently working collectively to move this case to the next step of recommending claim amounts for those investors who lost money in this fraudulent enterprise and, ultimately, proposing a plan of distribution.

Dated this 31st day of July, 2017.

**RECEIVER**

*Peggy Hunt, Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2017, I caused the foregoing *Second Status Report (April 1, 2017 Through June 30, 2017)* to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of the filing to all counsel of record in this case.

*/s/ Candy Long*

# Exhibit A

STANDARDIZED FUND ACCOUNTING REPORT for **Traffic Monsoon, LLC Receivership** - Cash Basis
Receivership; Civil Court Case No. 2:16-00832
REPORTING PERIOD 04/01/2017 TO 06/30/2017

| FUND ACCOUNTING (See Instructions): | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 04/01/17) | | | $49,620,759.68 |
| | *Increases in Fund Balance:* | | | |
| Line 2 | **Business Income** | - | - | |
| Line 3 | **Cash and Securities** | - | - | |
| Line 4 | **Interest/Dividend Income** | $30,558.91 | $30,558.91 | |
| Line 5 | **Business Asset Liquidation** | - | - | |
| Line 6 | **Personal Asset Liquidation** | - | - | |
| Line 7 | **Third-Party Litigation** | - | - | |
| Line 8 | **Miscellaneous - Other** | - | - | |
| | **Total Funds Available (Lines 1-8):** | | $30,558.91 | $49,651,318.59 |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | **Disbursements to Senior Secured Lenders/Investors** | - | | |
| Line 10 | **Disbursements for Receivership Operations** | | $953,283.65 | |
| Line 10 | *Internal Loans* | - | | |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $863,354.86 | | |
| Line 10b | *Business Asset Expenses* | $89,928.79 | | |
| Line 10c | *Personal Asset Expenses* | | | |
| Line 10d | *Hospital Settlements & Investment Expenses* | - | | |
| Line 10e | *Third-Party Litigation Expenses* | | | |
| | 1. Attorney Fees | - | | |
| | 2. Litigation Expenses | - | | |
| | *Total Third-party Litigation Expenses* | - | | |
| Line 10f | *Tax Administrator Fees and Bonds* | - | . | |
| Line 10g | *Federal and State Tax Payments* | - | | |
| | **Total Disbursements for Receivership Operations** | | $953,283.65 | $953,283.65 |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | - | - | |
| Line 11 | *Distribution Plan Development Expenses* | - | | |
| Line 11a | *Distribution Plan Development Expenses:* | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | Independent Distribution Consultant (IDC) | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses* | - | | |
| Line 11b | *Distribution Plan Implementation Expenses:* | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | IDC | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |

| | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | 3. Investor Identification: | | | |
| |    Notice/Publishing Approved Plan | - | | |
| |    Claimant Identification | - | | |
| |    Claims Processing | - | | |
| |    Web Site Maintenance/Call Center | - | | |
| | 4. Fund Administrator Bond | - | | |
| | 5. Miscellaneous | - | | |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | - | | |
| | *Total Plan Implementation Expenses* | | - | |
| | Total Disbursements for Distribution Expenses Paid by the Fund | | - | |
| Line 12 | Disbursements to Court/Other: | | - | |
| Line 12 | *Disbursements to Court* | | | |
| Line 12a |   Investment Expenses/Court Registry Investment System (CRIS) Fees | - | | |
| Line 12b |   Federal Tax Payments | - | | |
| | *Total Disbursements to Court/Other:* | | - | |
| | Total Funds Disbursed (Lines 9-11): | | | ($953,283.65) |
| Line 13 | Ending Balance (As of 06/30/17): | | | $48,698,034.94 |
| Line 14 | Ending Balance of Fund - Net Assets: | | | |
| Line 14a | *Cash & Cash Equivalents* | | | $48,698,034.94 |
| Line 14b | *Investments* | | | - |
| Line 14c | *Other Assets or Uncleared Funds* | | | - |
| |   Total Ending Balance of Fund - Net Assets | | | $48,698,034.94 |

| | OTHER SUPPLEMENTAL INFORMATION: | | | |
|---|---|---|---|---|
| | | Detail | Subtotal | Grand Total |
| Line 15 | *Report of Items NOT To Be Paid by the Fund:* | | | |
| | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | - | | |
| Line 15 | *Disbursements for Plan Administration Expenses* | - | | |
| Line 15a | *Plan Development Expenses Not Paid by the Fund:* | - | | |
| | 1. Fees: | - | | |
| |    Fund Administrator | - | | |
| |    IDC | - | | |
| |    Receiver | - | | |
| |    Legal Advisers | - | | |
| |    Accountants | - | | |
| |    Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses Not Paid by the Fund* | | - | |
| Line 15b | *Plan Implementation Expenses Not Paid by the Fund:* | - | | |
| | 1. Fees: | - | | |
| |    Fund Administrator | - | | |
| |    IDC | - | | |
| |    Receiver | - | | |
| |    Legal Advisers | - | | |
| |    Accountants | - | | |
| |    Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Investor Identification: | - | | |
| |    Notice/Publishing Approved Plan | - | | |
| |    Claimant Identification | - | | |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Claims Processing | - |  |  |
|  | Web Site Maintenance/Call Center | - |  |  |
|  | 4. Fund Administrator Bond | - |  |  |
|  | 5. Miscellaneous | - |  |  |
|  | 6. FAIR Reporting Expenses | - |  |  |
|  | *Total Plan Implementation Expenses Not Paid by the Fund* |  | - |  |
| Line 15c | *Tax Administrator Fees & Bonds Not Paid by the Fund* | - |  |  |
|  | **Total Disbursements for Plan Administrative Expenses Not Paid by the fund** |  | - | - |
| Line 16 | **Disbursements to Court/Other Not Paid by the Fund:** | - | - |  |
| Line 16a | *Investment Expenses/CRIS Fees* | - |  |  |
| Line 16b | *Federal Tax Payments* | - |  |  |
|  | **Total Disbursements to Court/Other Not Paid by the Fund:** | - | - |  |
| Line 17 | **DC & State Tax Payments** | - | - |  |
| Line 18 | **No. of Claims:** |  |  |  |
| Line 18a | *# of Claims Received This Reporting Period* |  |  | - |
| Line 18b | *# of Claims Received  Since Inception of Fund* |  |  | - |
| Line 19 | **No. of Claimants / Investors:** |  |  |  |
| Line 19a | *# of Claimants / Investors Paid This Reporting Period* |  |  | - |
| Line 19b | *# of Claimants / Investors Paid Since Inception of Fund* |  |  | - |

Receiver:

By: _____

(signature)

Mary Margaret Hunt
_____
(printed name)

Receiver
_____
(title)

Date: _____