Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Court-Appointed Receiver, Peggy Hunt*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff.<br><br>V.<br><br>TRAFFIC MONSOON, LLC, a Utah Limited Liability Company, and CHARLES DAVID SCOVILLE, an individual,<br><br>Defendants. | **RECEIVER'S THIRD STATUS REPORT**<br>*(JULY 1, 2017 THROUGH SEPTEMBER 30, 2017)*<br><br>2:16-cv-00832-JNP<br><br>The Honorable Jill N. Parrish |

Peggy Hunt, the Court-appointed Receiver (the "Receiver") for Traffic Monsoon, LLC and the assets of Charles David Scoville that were obtained directly or indirectly from Traffic Monsoon, hereby submits this *Third Status Report* (the "Status Report") for the period of July 1, 2017 through September 30, 2017 (the "Reporting Period"). This Status Report is being posted on the Receiver's website at www.trafficmonsoonreceivership.com.

# TABLE OF CONTENTS

I. Introduction ..................................................................................................................1

II. Summary of Key Events ............................................................................................1

    A. *Commencement of the Civil Enforcement Case and the TRO* ........................1

    B. *Appointment of the Receiver and Employment of Professionals* ...................2

    C. *The Preliminary Injunction* .................................................................................3

III. Work Done By The Receiver And Her Professionals During The Reporting Period ..............................................................................................................................4

    A. *Recreating Business Records* ...............................................................................4

        1. Electronic Financial Data .............................................................................5

        2. Investor Information ....................................................................................6

        3. Status of Reconstruction Project ................................................................6

    B. *Investor Communications* ....................................................................................7

    C. *Work on the Scoville Appeal* ...............................................................................9

    D. *Administration of Real and Personal Property* ...............................................10

    E. *General Administration* .....................................................................................10

IV. Financial Report .........................................................................................................11

    A. *Receivership Bank Accounts and Funds* .........................................................11

    B. *Standardized Fund Accounting Reports ("SFARs")* ......................................11

    C. *Administrative Expenses* ...................................................................................12

V. Conclusion ..................................................................................................................13

## I. Introduction

This Status Report includes a brief summary of key events in the case to date as set forth in Part II below. For a more detailed discussion about the background in this case, please see the *Receiver's First Status Report (July 26, 2016 Through March 31, 2017)* (the "First Status Report") and the *Receiver's Second Status Report (April 1, 2017 Through June 30, 2017)* (the "Second Status Report") (together, the "Prior Status Reports").[1] Part III of the Status Report is a summary of the Receiver's work during the Reporting Period. Part IV provides a financial summary.

All of the documents filed with the Court that are referenced in this Status Report are posted on the Receiver's website at www.trafficmonsoonreceivership.com.

## II. Summary of Key Events

### A. *Commencement of the Civil Enforcement Case and the TRO*

On July 26, 2016, the above-captioned case was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Traffic Monsoon, LLC ("Traffic Monsoon") and Charles David Scoville ("Scoville" and, together with Traffic Monsoon, the "Defendants"). The SEC claims, among other things, that between October 2014 and July 26, 2016, the Defendants engaged in securities fraud and operated a Ponzi scheme. It is

---

[1] Docket Nos. 91 & 104. The First Status Report incorporated the *Declaration of Receiver Peggy Hunt (Communications)* (the "Communications Declaration"), Docket No. 54; and the *Declaration of Peggy Hunt (Business Operations)* (the "Business Operations Declaration"), Docket No. 55.

1

alleged that the Defendants took approximately $207 million from over 162,000 investors primarily through the solicitation of an investment known as an "AdPack."[2]

At the time that the case was commenced, the United States District Court (the "Court") entered a *Temporary Restraining Order and Order Freezing Assets*, which, prior to the entry of the Preliminary Injunction discussed below, was amended by Orders entered on July 27, 2016 and on November 4, 2016 (collectively, the "TRO").[3] The TRO, among other things, prohibited the Defendants from operating and imposed an asset freeze of the Defendants' assets.

B. *Appointment of the Receiver and Employment of Professionals*

On July 27, 2016, just after the entry of the TRO, the Court entered an *Order Appointing Receiver* (the "Receivership Order"),[4] thus commencing the receivership. Ms. Hunt was appointed as the receiver of Traffic Monsoon and the assets of Scoville pending a determination as to whether a preliminary injunction should be entered in the case. Ms. Hunt is an attorney whose primary area of practice over the last 26 years has focused on bankruptcy (both liquidation and reorganization), insolvency and receivership law. She serves as a trustee in bankruptcy cases filed in the District of Utah, and regularly represents trustees and equity receivers appointed in cases involving Ponzi schemes and other types of securities fraud.

The Receiver immediately took control of known assets and commenced an investigation. This investigation, which is discussed in further detail in the Prior Status Reports and below, is ongoing. To assist with the investigation and the discharge of her duties, the Receiver obtained

---

[2] *See* Docket No. 2 (Complaint ¶ 2).

[3] Docket Nos. 8, 14 & 56.

[4] Docket No. 11.

4851-5484-0407\1

Court approval to employ Dorsey & Whitney LLP ("Dorsey") as her legal counsel, and Berkley Research Group ("BRG") as her forensic and general accounts.[5] The Receiver also contracted with a company called "Epiq" primarily to assist her with securing electronic data on Traffic Monsoon's servers and in managing investor communications.

C. *The Preliminary Injunction*

The SEC requested that the Court enter a preliminary injunction against Scoville and Traffic Monsoon. This request was contested by Scoville, and Scoville also filed a *Motion to Set Aside Receivership*.[6] On March 28, 2017,[7] after concluding a contested evidentiary hearing, the Court entered a *Preliminary Injunction* and an *Amended Order Appointing Receiver* ("Amended Receivership Order").[8] As a result, Scoville's objections to the SEC's request for the entry of a preliminary injunction were overruled, and Scoville's request to set aside the receivership was denied. Thus, Ms. Hunt has continued to serve as receiver.

While the exact terms of the "Preliminary Injunction" should be reviewed, the Court generally prohibits Scoville from operating Traffic Monsoon "or a business model substantially similar to Traffic Monsoon's sale of AdPacks."[9] The Court also imposes an asset freeze of all

---

[5] Docket Nos. 11 & 25 (Orders authorizing employment).

[6] Docket Nos. 32, 33, 45; *see also* Docket Nos. 38, 39, 48, 49, 53 (SEC response).

[7] Before the Court ruled on matters under advisement, Scoville filed a *Motion to Dismiss*, which is based substantially on the same arguments made in conjunction with his opposition to the entry of a preliminary injunction. Docket No. 70. Scoville has agreed that the SEC does not need to file a response to his Motion to Dismiss at this time. Docket Nos. 73-74 and 89.

[8] Docket Nos. 79 – 80. See Docket No. 91 (First Status Report, at 3 (summary of the preliminary injunction hearing).

[9] Docket No. 80 (Preliminary Injunction, p. 1).

"assets, of whatever kind and wherever situated, of Traffic Monsoon, LLC and Charles D. Scoville that were obtained directly or indirectly from Traffic Monsoon, LLC. . . ."[10] And, the Court has ordered a stay of all litigation in any court against either or both of the Defendants.[11] In conjunction with the Preliminary Injunction, the Court entered a *Memorandum Decision and Order*,[12] which includes significant factual findings and a comprehensive legal analysis. While the findings are summarized in part in the Receiver's First Status Report, important to note is that the Court concluded that a clear showing had been made that the SEC was likely to succeed in establishing that Traffic Monsoon was a Ponzi scheme.

During the Reporting Period, Scoville appealed the Amended Receivership Order and Preliminary Injunction, and this appeal is currently pending before the United States Court of Appeals for the Tenth Circuit (the "Scoville Appeal").

### III. Work Done By The Receiver And Her Professionals During The Reporting Period

#### A. *Recreating Business Records*

The primary focus of the Receiver's work during this Reporting Period continues to be in recreating Traffic Monsoon's business records. This work is vital in determining (i) the identity of investors, (ii) those investors with claims and the amounts of their claims, and (iii) whether the Receivership Estate has claims that would be beneficial to pursue. The Receiver has made significant progress in recreating the records during the Reporting Period, but as discussed below, this is an ongoing task. A short summary of the work that the Receiver and her

---

[10] Docket No. 80 (Preliminary Injunction, p. 2).

[11] Docket No. 80 (Preliminary Injunction, p. 3).

[12] Docket No. 79.

4

4851-5484-0407\1

professionals have engaged in during the Reporting Period, in compiling and analyzing both electronic data as well as information provided by Traffic Monsoon investors, is set forth below.

1.   Electronic Financial Data

Because Traffic Monsoon did not maintain independent financial or accounting records, identification of investors and claims has required compilation, analysis and categorization of voluminous electronic transaction records. These records are located in two primary places.

First, records, referred to as the "TM Data" exist on the imaged copies of Traffic Monsoon's servers that the Receiver maintains. The TM Data consists of over 500 million individual records or entries, maintained in approximately 150 different data tables. BRG has spent significant but necessary time during the Reporting Period deciphering and using the TM Data to create a working database that will assist the Receiver in her administration of the Receivership Estate.

Second, records of the financial entities that processed investor payments to and from Traffic Monsoon provide information about Traffic Monsoon's business, and the Receiver and her professionals have spent significant time during the Reporting Period requesting and analyzing information about these records. These "Financial Entities" are Paypal; Payza; Solid Trust Pay ("STP"); Allied Wallet; and Chase.[13] Like the TM Data, these records are voluminous. Data from PayPal's website portal includes over 5.5 million records; data from Pazya totals over 576,000 records; data from STP totals over 110,000 records; data from Allied Wallet includes over 100,800 records; and there are over 4,900 Chase transactions involving over $61 million in

---

[13] *See* Docket No. 91 (First Status Report, at 21-22 (discussing Defendant Accounts)).

both receipts and disbursements.[14] BRG is using these records as part of its creation of a working database.

### 2. Investor Information

In addition to compiling and analyzing the TM Data and the data from the Financial Entities, the Receiver continues to collect information from Traffic Monsson investors about their identity and investments. Information is being collected from two primary sources. First, the Receiver created a portal on the Receivership Website that allows investors to provide information about themselves and their Traffic Monsoon investments, and over 1,300 people have submitted information through the portal to date. Second, the Receiver collects information from investors based on email inquiries to the Receiver Email Address and calls made to the Call Center, both of which are discussed immediately below. She provides this information to BRG as a further point of reference in the reconstruction of Traffic Monsoon's records.

### 3. Status of Reconstruction Project

The Receiver is very cognizant of the need to finish the reconstruction project so that the case can move forward. This task has continued to be a challenge due to, among other things:

- The lack of traditional financial and accounting records;
- The massive volume of transactional and database activity on the Traffic Monsoon servers, the massive volume of data from each of the Financial Entities, the need to compare and reconcile both, and the need to categorize all data;
- Missing or inaccurate transaction referencing in the TM Data;

---

[14] *See* Docket No. 104 (Second Status Report, at 6-7).

- The lack of information related to the structure and function of the Traffic Monsoon website code and related MySQL data tables;

- The complexity of the Traffic Monsoon website code;

- The large number of investors and their varied geographical locations;

- Incomplete data initially provided from the various Financial Entities, and the time necessary for the Financial Entities to collect and produce complete data to the Receiver; and

- Understanding the varied and voluminous data provided by each of the Financial Entities.

The Receiver and her professionals have been meeting on a regular basis to discuss BRG's progress and tasks and, at this time, Receiver anticipates that by early December 2017 the vast majority of BRG's analysis will be complete.

B. *Investor Communications*

The Receiver and Dorsey have spent considerable time communicating with investors during the Reporting Period. A detailed summary of efforts in this regard through October 2016 is included in the Receiver's Communications Declaration. Below is a general summary and updated information.

Just prior to and immediately upon being appointed, the Receiver set up procedures at her law office for handling, responding to and tracking of investor phone calls, emails and all other written communications made to the Receiver at her office and through the Receivership Email Address (defined below). Two Dorsey employees have been tasked with managing these tasks for the Receiver, and this work is ongoing.

7

The Receiver and Dorsey also worked with Epiq to set up the "Receivership Website" at www.trafficmonsoonreceivership.com; and a "Call Center" to receive telephone calls, including providing translation services. The Receivership Website includes, among other things, (a) information about how to contact the Receiver, including a designated email address at trafficmonsoon.receiver.inquiries@dorsey.com ("Receiver Email Address") and telephone numbers for the Call Center; (b) updates about matters occurring in the SEC's case and matters being handled by the Receiver; (c) a posting of key documents filed in the case; and (d) as of the commencement of this Reporting Period, a portal for Traffic Monsoon investors to provide information to the Receiver about their respective identities, as well as the monies paid in and the monies received from Traffic Monsoon. Investor inquires made through the Receiver Email Address are handled by Dorsey employees with information provided to them by the Receiver. The Receiver is collecting information provided to her through emails to the Receiver Email Address and the investor information portal. As noted above, BRG is using this information to assist in the recreation of Traffic Monsoon's business records.

The Call Center is manned by Epiq with persons who are trained to obtain certain information from persons calling in, on how to answer the typical questions asked based on instructions provided by the Receiver, and on how to relay information about the Receivership Website. Epiq provides weekly reports to the Receiver summarizing the calls received and, if necessary, the Receiver communicates with Epiq about how to resolve certain inquiries. During the Reporting Period, the Receiver has provided updated information to Epiq to be used at the Call Center.

The Receiver also has been given access to Traffic Monsoon's PayPal accounts. BRG is using this access to assist it in recreating and analyzing Traffic Monsoon's financial records. Additionally, Dorsey has used this access to respond to numerous "chargeback" requests made by investors in an attempt to ensure that all investors are treated in a fair manner with respect to their claims against the Receivership Estate.[15]

Finally, during the Reporting Period, the Receiver has been contacted by several groups of investors in various contexts, including counsel in a proposed class of investors who claim to have used PayPal for their Traffic Monsoon investments, and a group of investors who claim that their money was invested with Traffic Monsoon through a person who is now involved in a security enforcement action outside of the United States. In the case of the PayPal class, the Receiver and her counsel have spent time during the Reporting Period evaluating the potential interests of the Receivership Estate and communicating with counsel for the proposed class. In all instances, the Receiver has worked with those who have contacted her to, among other things, gather information as part of her investigation.

C. *Work on the Scoville Appeal*

As noted in Part II above, Scoville filed a Notice of Appeal with the Tenth Circuit Court of Appeals, appealing the Court's Preliminary Injunction and Amended Receivership Order. In his Notice of Appeal, Scoville stated that both he personally and Traffic Monsoon are appellants. The Receiver and Dorsey have spent time during the Reporting Period reviewing Scoville's opening brief and attending to the incorrect naming of Traffic Monsoon as an appellant inasmuch

---

[15] Docket No. 91 (First Status Report, at 12 (discussing chargeback issues)).

as the Receiver did not authorize any party to file an appeal. Scoville's counsel indicated that a stipulation to dismiss Traffic Monsoon from the appeal was possible, and thus, the Receiver spent time working on this stipulation. Ultimately, however, Scoville did not so stipulate and the Receiver has been required to take appropriate action in the appeal.

D. *Administration of Real and Personal Property*

A summary of real and personal property identified by the Receiver to date is included in the Prior Status Reports, and those Reports should be consulted to understand the scope of assets known at this time.[16]

During the Reporting Period, the Receiver attended to issues in maintaining the property known as the "Manchester Flat,"[17] including paying homeowner's fees and council taxes.

Furthermore, the Receiver worked on obtaining funds of the Receivership Estate held by Allied Wallet. Just prior to the close of the Reporting Period, the Receiver obtained Allied Wallet's agreement to turnover over $4.3 million. Just after the close of the Reporting Period, the Receiver recovered over $2.1 million from Allied Wallet, she received another $1 million on November 1, 2017, and she will recover the remaining amount by December 1, 2017. More details about the turnover of these funds will be included in the next Status Report.

E. *General Administration*

During the Reporting Period, the Receiver, her counsel and BRG have attended to numerous matters related to the administration of the Receivership Estate. These tasks include, but are not limited to, monitoring and managing bank accounts; following accounting protocols;

---

[16] Docket No. 91 (First Status Report, at 12-14).

[17] *Id.,* at 13.

10

preparing SFARs (as defined below); evaluating and paying costs related to administration; attending to mail;[18] evaluating issues related to compliance with applicable tax laws; filing papers required by applicable tax laws; communicating with investors and interfacing with financial account institutions; and coordinating with governmental entities as requested. The Receiver has also spent time during the Reporting Period negotiating a more favorable rate of return on the funds held in the Receivership Estate's bank accounts.

IV. **Financial Report**

    A. *Receivership Bank Accounts and Funds*

The Receiver currently has a funded "Operating Account" which does not earn interest, and a funded "Money Market Account" which earns interest. As of the date of the end of the Reporting Period, the Operating Account had a balance of $96,063.30, and the Money Market Account had a balance of $48,636,096.64.

    B. *Standardized Fund Accounting Reports ("SFARs")*

Deposits and withdrawals from both accounts and a reporting of the assets of the Receivership Estate are set forth SFARs that are prepared quarterly by BRG at the Receiver's direction. The SFAR for the Reporting Period is attached hereto as **Exhibit A**. As set forth in the current SFAR, the Receivership Estate earned interest income in the total amount of $43,085.30 during the Reporting Period.

---

[18] Shortly after her appointment, the Receiver redirected mail for the Defendants to her office. Since the entry of the Preliminary Injunction, the Receiver has informed Scoville through his counsel that she will forward his personal mail to him when it is received by her, and she has done so during the Reporting Period.

C. *Administrative Expenses*

The fees and out of pocket expenses of the Receiver, Dorsey and BRG must be approved by the Court prior to payment. During the Reporting Period, the Receiver prepared and filed with the Court a *Second Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered From April 1, 2017 Through June 30, 2017*. On October 23, 2017, the Court entered an *Order* approving that Application and allowing the fees and expenses requested by the Receiver, Dorsey and BRG.[19] The Receiver thus has paid the following in accordance with the Order: (i) a total of $28,885.00 in allowed fees were paid to the Receiver; (ii) Dorsey was paid a total of $43,760.05 in allowed fees and expenses; and (iii) BRG was paid a total of $96,791.33 in allowed fees and expenses.

During the current Reporting Period, the Receiver has worked a total of 53.4 hours providing receivership services to the Receivership Estate for which fees in the total amount of $15,865.60 have been incurred after voluntary reductions. Dorsey has worked a total of 72 hours and provided legal services to the Receivership Estate for which fees in the total amount of $21,252.00 and out-of-pocket expenses in the total amount of $512.29 have been incurred after voluntary reductions. And, BRG has worked a total of 516.70 hours providing forensic and general accounting services to the Receivership Estate for which fees in the total amount of $127,643.50 and out-of-pocket expenses in the total amount of $50.80 have been incurred after voluntary reductions.

The Receiver intends to file a Third Interim Fee Application for this Reporting Period shortly after the filing of this Status Report.

---

[19] Docket No. 107.

## V. Conclusion

This is a complicated case which has been complicated, in large part, by the Defendants' failure to maintain financial records. The Receiver has made significant progress in recreating Traffic Monsoon's records during this Reporting Period and she anticipates that by early December 2017 the vast majority of BRG's analysis will be complete which will assist her in administering the Receivership Estate. She understands that making Pa distribution to those holding claims is of paramount importance, and she and her team are diligently working collectively to move this case to the next step of recommending claim amounts for those investors who lost money in this fraudulent enterprise and, ultimately, proposing a plan of distribution.

Dated this 29th day of November, 2017.

RECEIVER

_____
Peggy Hunt, Receiver

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2017, I caused the foregoing *Third Status Report (July 1, 2017 Through September 30, 2017)* to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of the filing to all counsel of record in this case.

                                                              */s/ Candy Long*

EXHIBIT A

## STANDARDIZED FUND ACCOUNTING REPORT for Traffic Monsoon, LLC Receivership - Cash Basis
### Receivership; Civil Court Case No. 2:16-00832
### REPORTING PERIOD 07/01/2017 TO 09/30/2017

| | FUND ACCOUNTING (See Instructions): | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 07/01/17) | | | $48,698,034.94 |
| | *Increases in Fund Balance:* | | | |
| Line 2 | Business Income | - | - | |
| Line 3 | Cash and Securities | - | - | |
| Line 4 | Interest/Dividend Income | $43,085.30 | $43,085.30 | |
| Line 5 | Business Asset Liquidation | - | - | |
| Line 6 | Personal Asset Liquidation | - | - | |
| Line 7 | Third-Party Litigation | - | - | |
| Line 8 | Miscellaneous - Other | - | - | |
| | Total Funds Available (Lines 1-8): | | $43,085.30 | $48,741,120.24 |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | Disbursements to Senior Secured Lenders/Investors | - | - | |
| Line 10 | Disbursements for Receivership Operations | | $8,960.30 | |
| Line 10 | *Internal Loans* | - | | |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $5,801.19 | | |
| | 1. Fees: | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | $5,801.19 | | |
| Line 10b | *Business Asset Expenses* | - | | |
| Line 10c | *Personal Asset Expenses* | $3,159.11 | | |
| Line 10d | *Hospital Settlements & Investment Expenses* | - | | |
| Line 10e | *Third-Party Litigation Expenses* | | | |
| | 1. Attorney Fees | - | | |
| | 2. Litigation Expenses | - | | |
| | *Total Third-party Litigation Expenses* | - | | |
| Line 10f | *Tax Administrator Fees and Bonds* | - | | |
| Line 10g | *Federal and State Tax Payments* | - | | |
| | Total Disbursements for Receivership Operations | | $8,960.30 | $8,960.30 |
| Line 11 | Disbursements for Distribution Expenses Paid by the Fund: | - | - | |
| Line 11 | *Distribution Plan Development Expenses* | - | | |
| Line 11a | *Distribution Plan Development Expenses:* | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | Independent Distribution Consultant (IDC) | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses* | - | | |
| Line 11b | *Distribution Plan Implementation Expenses:* | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | IDC | - | | |

| | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Investor Identification: | - | | |
| | Notice/Publishing Approved Plan | - | | |
| | Claimant Identification | - | | |
| | Claims Processing | - | | |
| | Web Site Maintenance/Call Center | - | | |
| | 4. Fund Administrator Bond | - | | |
| | 5. Miscellaneous | - | | |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | - | | |
| | *Total Plan Implementation Expenses* | | - | |
| | **Total Disbursements for Distribution Expenses Paid by the Fund** | | - | - |
| Line 12 | **Disbursements to Court/Other:** | | - | |
| Line 12 | *Disbursements to Court* | | | |
| Line 12a | *Investment Expenses/Court Registry Investment System (CRIS) Fees* | - | | |
| Line 12b | *Federal Tax Payments* | - | | |
| | **Total Disbursements to Court/Other:** | | - | |
| | **Total Funds Disbursed (Lines 9-11):** | | | $8,960.30 |
| Line 13 | **Ending Balance (As of 09/30/17):** | | | $48,732,159.94 |
| Line 14 | **Ending Balance of Fund - Net Assets:** | | | |
| Line 14a | *Cash & Cash Equivalents* | | | $48,732,159.94 |
| Line 14b | *Investments* | | | - |
| Line 14c | *Other Assets or Uncleared Funds* | | | - |
| | **Total Ending Balance of Fund - Net Assets** | | | $48,732,159. |

| | OTHER SUPPLEMENTAL INFORMATION: | | | |
|---|---|---|---|---|
| | | Detail | Subtotal | Grand Total |
| Line 15 | *Report of Items NOT To Be Paid by the Fund:* **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | - | | - |
| Line 15 | *Disbursements for Plan Administration Expenses* | - | | |
| Line 15a | Plan Development Expenses Not Paid by the Fund: | - | | |
| | 1. Fees: | | | |
| | Fund Administrator | - | | |
| | IDC | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses Not Paid by the Fund* | | - | |
| Line 15b | Plan Implementation Expenses Not Paid by the Fund: | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | IDC | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Consultants | - |  |  |
|  | 2. Administrative Expenses | - |  |  |
|  | 3. Investor Identification: | - |  |  |
|  | Notice/Publishing Approved Plan | - |  |  |
|  | Claimant Identification | - |  |  |
|  | Claims Processing | - |  |  |
|  | Web Site Maintenance/Call Center | - |  |  |
|  | 4. Fund Administrator Bond | - |  |  |
|  | 5. Miscellaneous | - |  |  |
|  | 6. FAIR Reporting Expenses | - |  |  |
|  | *Total Plan Implementation Expenses Not Paid by the Fund* |  |  | - |
| Line 15c | *Tax Administrator Fees & Bonds Not Paid by the Fund* | - |  |  |
|  | **Total Disbursements for Plan Administrative Expenses Not Paid by the fund** |  | - | - |
| Line 16 | **Disbursements to Court/Other Not Paid by the Fund:** |  |  |  |
| Line 16a | *Investment Expenses/CRIS Fees* | - |  |  |
| Line 16b | *Federal Tax Payments* | - |  |  |
|  | **Total Disbursements to Court/Other Not Paid by the Fund:** |  | - | - |
| Line 17 | **DC & State Tax Payments** | - | - |  |
| Line 18 | **No. of Claims:** |  |  |  |
| Line 18a | *# of Claims Received This Reporting Period* |  |  | - |
| Line 18b | *# of Claims Received Since Inception of Fund* |  |  | - |
| Line 19 | **No. of Claimants / Investors:** |  |  |  |
| Line 19a | *# of Claimants / Investors Paid This Reporting Period* |  |  | - |
| Line 19b | *# of Claimants / Investors Paid Since Inception of Fund* |  |  | - |

Receiver:
By: _(signature)_
Mary Margaret Hunt
(printed name)

Receiver
(title)

Date: 11-29-17