Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
111 South Main Street, 21st Floor
Salt Lake City, UT  84111-2176
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Court-Appointed Receiver, Peggy Hunt*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff.<br><br>    V.<br><br>TRAFFIC MONSOON, LLC, a Utah Limited Liability Company, and CHARLES DAVID SCOVILLE, an individual,<br><br>          Defendants. | **RECEIVER'S FOURTH STATUS REPORT**<br>*(OCTOBER 1, 2017 THROUGH DECEMBER 31, 2017)*<br><br>2:16-cv-00832-JNP<br><br>The Honorable Jill N. Parrish |

Peggy Hunt, the Court-appointed Receiver (the "Receiver") for Traffic Monsoon, LLC and the assets of Charles David Scoville that were obtained directly or indirectly from Traffic Monsoon, hereby submits this *Fourth Status Report* (the "Status Report") for the period of October 1, 2017 through December 31, 2017 (the "Reporting Period").  This Status Report is posted on the website for the receivership at www.trafficmonsoonreceivership.com (the "Receivership Website").

## TABLE OF CONTENTS

I.      **Introduction** ...................................................................................................1

II.     **Summary of Key Events** ...............................................................................2

      A.      *Commencement of The Civil Enforcement Case and the TRO* ...............2
      B.      *Appointment of The Receiver and Employment of Professionals* ............2
      C.      *The Preliminary Injunction* .................................................................3
      D.      *The Tenth Circuit Appeal* ....................................................................5

III.    **Work Done By The Receiver And Her Professionals During The Reporting Period** ...........................................................................................................5

      A.      *Recreating Business Records* ................................................................5
      B.      *Investigating And Attending To Asset Recovery* ....................................6
      C.      *Investigating Claims Procedures* ..........................................................6
      D.      *Communicating With Investors* ............................................................7
      E.      *Collecting Investor Information* ............................................................9
      F.      *Analysis of Issues Related to Payment Processors* .................................9
      G.      *Working On Matters Related To The Tenth Circuit Appeal* ....................9
      H.      *Attending to General Administration of The Receivership Estate* ........10

IV.     **Results of Preliminary Forensic Analysis** ...............................................10

V.      **Financial Report** ......................................................................................12

      A.      *Standardized Fund Accounting Report ("SFAR")* .............................12
      B.      *Administrative Expenses Requested And Paid During The Reporting Period* ...............................................................................................12

            1.      Quarterly Fee Applications Relevant to this Reporting Period .................13
            2.      Fees and Expenses Incurred During the Current Reporting Period ..........13

VI.     **Conclusion** ...............................................................................................15

## I.  __Introduction__

This Status Report includes a brief summary of key events in this case to date as set forth in Part II below.  Part III is a summary of the Receiver's work during the Reporting Period, and Part IV provides a summary of key findings to date.  Part V is a financial summary of the Receivership Estate.  All of the documents filed with the Court that are referenced in this Status Report are posted on the Receivership's website at www.trafficmonsoonreceivership.com (the "Receivership Website")

Please note that a more detailed discussion about the background in this case is set forth in the *Receiver's First Status Report (July 26, 2016 Through March 31, 2017)* (the "First Status Report"),[1] which incorporated the Receiver's *Declarations* outlining the initial findings of her investigation.[2]  Since filing that First Status Report, the Receiver has continued to file quarterly Status Reports that also may be consulted for information about this case.  To date the following additional Status Reports have been filed:  *Receiver's Second Status Report (April 1, 2017 Through June 30, 2017)*;[3] and *Receiver's Third Status Report (July 1, 2017 Through September 30, 2017)* (these Reports, together with the First Status Report, are the "Prior Status Reports").[4] All of the Prior Status Reports are posted on the Receivership Website.

---

[1] Docket No. 91.

[2] *See Declaration of Receiver Peggy Hunt (Communications)* (the "Communications Declaration"), Docket No. 54; and the *Declaration of Peggy Hunt (Business Operations)* (the "Business Operations Declaration"), Docket No. 55.

[3] Docket No. 104.

[4] Docket No. 108.

## II.   Summary of Key Events

### A.   *Commencement of The Civil Enforcement Case and the TRO*

On July 26, 2016, the above-captioned case (the "Civil Enforcement Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Traffic Monsoon, LLC ("Traffic Monsoon") and Charles David Scoville ("Scoville" and, together with Traffic Monsoon, the "Defendants").  The SEC claims, among other things, that between October 2014 and July 26, 2016, the Defendants engaged in securities fraud and operated a Ponzi scheme.  It is alleged that the Defendants took approximately $207 million from over 162,000 investors primarily through the solicitation of an investment known as an "AdPack."[5]

At the time that the Civil Enforcement Case was commenced, the United States District Court for the District of Utah (the "Court") entered a *Temporary Restraining Order and Order Freezing Assets*, which, prior to the entry of the Preliminary Injunction discussed below, was amended by Orders entered on July 27, 2016 and on November 4, 2016 (collectively, the "TRO").[6]  The TRO, among other things, prohibited the Defendants from operating and imposed an asset freeze of the Defendants' assets.

### B.   *Appointment of The Receiver and Employment of Professionals*

On July 27, 2016, just after the entry of the TRO, the Court entered an *Order Appointing Receiver* (the "Receivership Order"),[7]  thus commencing the receivership.  Ms. Hunt was

---

[5] *See* Docket No. 2 (Complaint ¶ 2).

[6] Docket Nos. 8, 14 & 56.

[7] Docket No. 11.

4811-2433-4430\1

appointed as the receiver of Traffic Monsoon and the assets of Scoville pending a determination as to whether a preliminary injunction should be entered in the Civil Enforcement Case.  Ms. Hunt is an attorney whose primary area of practice over the last 26 years has focused on bankruptcy (both liquidation and reorganization), insolvency and receivership law.  She serves as a trustee in bankruptcy cases filed in the District of Utah, and regularly represents trustees and equity receivers appointed in cases involving Ponzi schemes and other types of securities fraud.

The Receiver immediately took control of known assets and commenced an investigation. This investigation, which is discussed in further detail in the Prior Status Reports and below, is ongoing.  To assist with the investigation and the discharge of her duties, the Receiver obtained Court approval to employ Dorsey & Whitney LLP ("Dorsey") as her legal counsel, and Berkley Research Group ("BRG") as her forensic and general accounts.[8] The Receiver also contracted with a company called "Epiq" primarily to assist her with securing electronic data on Traffic Monsoon's servers and in managing investor communications.

C.      *The Preliminary Injunction*

The SEC requested that the Court enter a preliminary injunction in the Civil Enforcement Case against Scoville and Traffic Monsoon.  This request was contested by Scoville, and Scoville also filed a *Motion to Set Aside Receivership*.[9]  On March 28, 2017,[10] after concluding a

---

[8] Docket Nos. 11 & 25 (Orders authorizing employment).

[9] Docket Nos. 32, 33, 45; *see also* Docket Nos. 38, 39, 48, 49, 53 (SEC response).

[10] Before the Court ruled on matters under advisement, Scoville filed a *Motion to Dismiss*, which is based substantially on the same arguments made in conjunction with his opposition to the entry of a preliminary injunction.  Docket No. 70. Scoville has agreed that the SEC does not need to file a response to his Motion to Dismiss at this time.  Docket Nos. 73-74 and 89.

3

contested evidentiary hearing, the Court entered a *Preliminary Injunction* and an *Amended Order Appointing Receiver* ("Amended Receivership Order").[11] As a result, Scoville's objections to the SEC's request for the entry of a preliminary injunction were overruled, and Scoville's request to set aside the receivership was denied. Thus, Ms. Hunt has continued to serve as receiver.

While the exact terms of the "Preliminary Injunction" should be reviewed, the Court generally prohibits Scoville from operating Traffic Monsoon "or a business model substantially similar to Traffic Monsoon's sale of AdPacks."[12] The Court also imposes an asset freeze of all "assets, of whatever kind and wherever situated, of Traffic Monsoon, LLC and Charles D. Scoville that were obtained directly or indirectly from Traffic Monsoon, LLC. . . ."[13] And, the Court has ordered a stay of all litigation in any court against either or both of the Defendants.[14] In conjunction with the Preliminary Injunction, the Court entered a *Memorandum Decision and Order*,[15] which includes significant factual findings and a comprehensive legal analysis. While the findings are summarized in part in the Receiver's First Status Report, important to note is that the Court concluded that a clear showing had been made that the SEC was likely to succeed in establishing that Traffic Monsoon was a Ponzi scheme.

---

[11] Docket Nos. 79 – 80. See Docket No. 91 (First Status Report, at 3 (summary of the preliminary injunction hearing).

[12] Docket No. 80 (Preliminary Injunction, p. 1).

[13] Docket No. 80 (Preliminary Injunction, p. 2).

[14] Docket No. 80 (Preliminary Injunction, p. 3).

[15] Docket No. 79.

      D.     *The Tenth Circuit Appeal*

Scoville has appealed the Amended Receivership Order and Preliminary Injunction, and this appeal is currently pending before the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit Appeal").[16]  The Tenth Circuit Appeal has been fully briefed by the parties, and oral argument has been scheduled by the Tenth Circuit to take place on March 21, 2018 in Denver, Colorado.

## III.    Work Done By The Receiver And Her Professionals During The Reporting Period

      A.     *Recreating Business Records*

Traffic Monsoon did not maintain independent financial or accounting records.  Thus, the primary focus of the Receiver since her appointment has been in recreating Traffic Monsoon's business records, and this work has continued during this Reporting Period.  Recreating Traffic Monsoon's records has been vital in determining (i) the identity of investors, (ii) those investors with claims and the amounts of their claims, and (iii) whether the Receivership Estate has claims that would be beneficial to pursue.  As described in Prior Status Reports, this has been an immense job requiring, among other things, the collection of enormous amounts of information.  In addition to the data on Traffic Monsoon's servers secured by the Receiver, information was in large part procured consensually by Dorsey and BRG from financial institutions and payment processers that served Traffic Monsoon and its investors.  After collecting this data, which involved literally hundreds of millions of records and transactions approximating a billion

---

[16] *SEC v. Traffic Monsoon, LLC et al.*, Case No. 17-4059 (10th Cir.).  Copies of documents filed in the Tenth Circuit Appeal are on the Receivership Website under the tab titled "Scoville Appeal Documents".

dollars, it was necessary for BRG to analyze, and then categorize the information in a manner that the Receivership Estate could effectively put to use.

As of the end of the Reporting Period, the Receiver had completed the primary work on records recreation. There is still some work left to be done in this area, but the Receiver now has sufficient information to identify investors and determine claims, thus allowing her to take the next steps in administering the Receivership Estate.

B.    *Investigating And Attending To Asset Recovery*

Early in December 2017, BRG provided the Receiver with an initial analysis of its recreation of Traffic Monsoon's records. As a result of this analysis, the Receiver determined that she should commence work involving investigating and identifying certain claims of the Receivership Estate that may exist against, among others, those who profited from their investments with Traffic Monsoon. Dorsey is assisting the Receiver with this work, and the work is ongoing.

In addition to investigating potential avenues of recovery, the Receiver has worked on consensually obtaining funds of the Receivership Estate held by payment processor Allied Wallet. As of the close of the Reporting Period, Allied Wallet has turned over a total of $4.36 million to the Receivership Estate.

C.    *Investigating Claims Procedures*

As noted above, in early December 2017, BRG provided the Receiver with an initial analysis of its recreation of Traffic Monsoon's records. As a result of this analysis, the Receiver determined that she should commence an investigation into an appropriate process for persons who lost money as a result of their investments in Traffic Monsoon, thereby allowing such

6

persons to make claims for their losses.  Dorsey is assisting the Receiver with this work.  The Receiver's analysis of creating and obtaining approval of appropriate claims procedures is ongoing.  This work will be complex given the number of claims that exist and the location of the claimants.

       D.     *Communicating With Investors*

The Receiver and Dorsey have spent time communicating with investors during the Reporting Period.  A detailed summary of efforts in this regard through October 2016 is included in the Receiver's Communications Declaration.  Below is a general summary and updated information.

Just prior to and immediately upon being appointed, the Receiver set up procedures at her law office for handling, responding to and tracking of investor phone calls, emails and all other written communications made to the Receiver at her office and through the Receivership Email Address (defined below).  Two Dorsey employees have been tasked with managing these tasks for the Receiver, and this work is ongoing.

The Receiver and Dorsey also worked with Epiq to set up the "Receivership Website" at www.trafficmonsoonreceivership.com; and a "Call Center" to receive telephone calls, including providing translation services.  The Receivership Website includes, among other things, (a) information about how to contact the Receiver, including a designated email address at trafficmonsoon.receiver.inquiries@dorsey.com ("Receiver Email Address") and telephone numbers for the Call Center; (b) updates about matters occurring in the Civil Enforcement Case, including the Tenth Circuit Appeal, and matters being handled by the Receiver; (c) a posting of key documents filed in the Civil Enforcement Case; and (d) a portal for Traffic Monsoon

investors to provide information to the Receiver about their respective identities, as well as the monies paid in and the monies received from Traffic Monsoon.  Investor inquiries made through the Receiver Email Address are handled by Dorsey employees with information provided to them by the Receiver.  The Receiver is collecting information provided to her through the Receiver Email Address and the investor information portal, and during the Reporting Period, this information has been used to supplement the recreation of Traffic Monsoon's records.

The Call Center is manned by Epiq with persons who are trained to obtain certain information from persons calling in, on how to answer the typical questions asked based on instructions provided by the Receiver, and on how to relay information about the Receivership Website.  Epiq provides weekly reports to the Receiver summarizing the calls received and, if necessary, the Receiver communicates with Epiq about how to resolve certain inquiries.

The Receiver also has been given access to Traffic Monsoon's PayPal, Payza and Solid Trust Pay accounts.  BRG used this access to assist it in recreating and analyzing Traffic Monsoon's financial records.  Additionally, Dorsey has used this access to respond to numerous "chargeback" requests made by investors in an attempt to ensure that all investors are treated in a fair manner with respect to their claims against the Receivership Estate.[17]

Finally, during the Reporting Period, the Receiver has been in communication with investor groups in various contexts, including counsel for a group of investors who claim that their money was invested with Traffic Monsoon through a person who is now involved in a security enforcement action outside of the United States.

---

[17] Docket No. 91 (First Status Report, at 12 (discussing chargeback issues)).

E.     _Collecting Investor Information_

The Receiver continued during the Reporting Period to collect information from Traffic Monsoon investors about their identity and investments primarily from two sources: (i) the portal on the Receivership Website through which investors provide information about themselves and their Traffic Monsoon investments; and (ii) email inquiries to the Receiver Email Address and calls made to the Call Center.  Among other things, the Receiver has been categorizing this information and providing it to BRG to assist it with recreating Traffic Monsoon's records.

F.     _Analysis of Issues Related to Payment Processors_

There are several issues related to payment processors that required services during the Receivership Period.  First, a group of Traffic Monsoon investors filed an action against PayPal.  During the Reporting Period, the Receiver has spent time monitoring this action to understand its potential impact on the Receivership Estate.  Additionally, PayPal has suggested that it may have an interest in certain assets of the Receivership Estate.  During the Reporting Period, the Receiver engaged in limited analysis of this matter.  Finally, the Receiver continues to assess issues related to payment processors, including monies not turned over and chargeback issues.  As noted above, as a result of negotiations with payment processor Allied Wallet, the Receiver has secured over $4.36 million on a consensual basis for the Receivership Estate.

G.     _Working On Matters Related To The Tenth Circuit Appeal_

As noted in Part II above, Scoville filed a Notice of Appeal, appealing the Court's Preliminary Injunction and Amended Receivership Order.  During the Reporting Period, the Receiver, through Dorsey, prepared and filed in the Tenth Circuit a _Motion for Leave to File_

*Amicus Curiae Brief* (the "Amicus Motion") and an *Amicus Curiae Brief*.[18]   Scoville filed an

*Opposition* to the Receiver's Amicus Motion, and the Receiver filed a *Reply*.   On November 6,

2017, the Tenth Circuit entered an *Order* provisionally granting the Receiver's Amicus Motion.

Scoville and the SEC have now fully briefed the Tenth Circuit Appeal.   As noted above,

the Tenth Circuit has scheduled oral argument for March 21, 2018 in Denver, Colorado.

     H.     <u>*Attending to General Administration of The Receivership Estate*</u>

During the Reporting Period, the Receiver, Dorsey, and BRG have attended to numerous

matters related to the administration of the Receivership Estate.   These tasks include, but are not

limited to, drafting and providing status reports; monitoring and managing bank accounts;

following accounting protocols; preparing SFARs (as defined below); evaluating and paying

costs related to administration; attending to mail;[19] evaluating issues related to compliance with

applicable tax laws; filing papers required by applicable tax laws; communicating with investors

and interfacing with financial account institutions; coordinating with governmental entities as

requested; and, when necessary, responding statements made or inquires by Scoville and/or his

counsel.

**IV.**     <u>**Results of Preliminary Forensic Analysis**</u>

As discussed in Part III above, as of the close of the Reporting Period, BRG recreated a

large part of Traffic Monsoon's financial records.   There is still work to be done in this area.

---

[18] Copies of documents filed in the Tenth Circuit Appeal are on the Receivership Website under the tab titled "Scoville Appeal Documents".

[19] Shortly after her appointment, the Receiver redirected mail for the Defendants to her office.  Since the entry of the Preliminary Injunction, the Receiver has informed Scoville through his counsel that she will forward his personal mail to him when it is received by her, and she has done so during the Reporting Period.

But, based on its work to date, BRG has been able to not only identify a majority of the investors, but also to provide a preliminary report on individuals with claims against the Receivership Estate and those who profited from their involvement with Traffic Monsoon.

Specifically, using the recreated records, BRG has been able to determine on a preliminary basis that there are 101,840 persons with claims against the Receivership Estate, and that the amount of total claims is in excess of $114,286,000.00.  Claims against the Receivership Estate exist if the total cash paid by an individual to Traffic Monsoon is more than the total cash received back (if any) by that individual.  There is no credit in this analysis for profits or returns that the investor thought he or she might receive by paying cash to Traffic Monsoon.

In addition, using the recreated records, BRG has been able to determine on a preliminary basis that 442,992 investors made money through their involvement with Traffic Monsoon.  A profit under this scenario exists if the net amount of all cash paid by Traffic Monsoon to the investor is in excess of all the cash paid by the investor to Traffic Monsoon.  According to the preliminary report, 95 investors earned profits in excess of $50,000.

While these are preliminary reports, the Receiver is using this preliminary information to guide her in decisions related to the administration of the Receivership Estate.  First and foremost, as a result of this information, the Receiver will commence devising and proposing to the Court for approval a process for those individuals with claims to make a claim against the Receivership Estate.

V.        **Financial Report**

      A.        *Standardized Fund Accounting Report ("SFAR")*

A summary of the financial condition of the Receivership Estate as of the end of the Reporting Period is set forth in the SFAR, a copy of which is attached hereto as **Exhibit A**.  At the end of the Reporting Period, the Receivership Estate had funds in the total amount of $52,949,602.87.[20]

      B.        *Administrative Expenses Requested And Paid During The Reporting Period*

The fees and out of pocket expenses of the Receiver, Dorsey and BRG must be approved by the Court prior to payment.  The Court has entered an *Order Establishing Administrative Expense Payment Procedures* (the *"Fee Procedures Order"*),[21] setting forth procedures for the request and payment of professional fees and expenses in this case.  Among other things, the Fee Procedures Order authorizes the Receiver and her professionals to file monthly "Notices of Request for Payment".  Absent objection in accordance with the Fee Procedures Order, the Receiver may pay 80% of fees and 100% of out-of-pocket expenses requested in a Notice of Request for Payment.  All monthly disbursements and any other requests for fees and expenses not requested pursuant to a Notice for Request for Payment are subject to Court approval through "Fee Applications" filed quarterly.  Below is a summary of quarterly Fee Applications that have been filed during the Reporting Period, and of the fees and expenses that have been incurred during the current Reporting Period.

---

[20] *See* Exh. A (SFAR).

[21]  Docket No. 101.

1.      <u>Quarterly Fee Applications Relevant to this Reporting Period</u>

Prior to the start of the current Reporting Period, the Receiver filed a *Second Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered From April 1, 2017 Through June 30, 2017* (the "<u>Second Application</u>").[22]  This Second Application was approved by the Court by *Order* entered on October 23, 2017,[23] and the Receiver was paid a total of $28,885.00 in allowed fees; Dorsey was paid a total of $43,760.05 in allowed fees and expenses; and BRG was paid a total of $96,791.33 in allowed fees and expenses.[24]  During the Reporting Period, the Receiver also prepared and filed a *Third Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered From July 1, 2017 Through September 30, 2017* (the "<u>Third Application</u>"),[25] requesting allowance and authorization to pay $15,865.60 in fees to the Receiver; $21,764.29 in fees and expenses to Dorsey; and $127,694.30 in fees and expenses to BRG.   As of the close of the Reporting Period, the Court had not entered an Order approving this Third Application.

2.      <u>Fees and Expenses Incurred During the Current Reporting Period</u>

During the Reporting Period of October 1 through December 31, 2017, the Receiver has worked a total of 50.5 hours providing receivership services to the Receivership Estate for which fees in the total amount of $15,748.65 have been incurred after voluntary reductions.  Dorsey has worked a total of 199 hours and provided legal services to the Receivership Estate for which fees

---

[22] Docket No. 105.

[23] Docket No. 107.

[24] *See* Exh. A (SFAR).

[25] Docket No. 109.

in the total amount of $59,704.00  and out-of-pocket expenses in the total amount of $49.27 have been incurred after voluntary reductions.  And, BRG has worked a total of 371.8 hours providing forensic and general accounting services to the Receivership Estate for which fees in the total amount of $96,546.50 and out-of-pocket expenses in the total amount of $31.00 have been incurred after voluntary reductions.

In conjunction with these services, the Receiver filed Notices of Request for Payment for the months of October and November 2017 as permitted under the Fee Procedures Order.  A *Notice of Request for Payment by Receiver and Receiver's Professional (October 1, 2017 Through October 31, 2017)* (the "October Notice")[26] was filed on December 12, 2017; and a *Notice of Request for Payment by Receiver and Receiver's Professional (November 1, 2017 Through November 30, 2017)* (the "November Notice")[27] was filed on December 21, 2017.  No objections were made to the October Notice or the November Notice.  As of the close of the Reporting Period, therefore, the Receiver was paid $5,744.88, Dorsey was paid $20,296.40, and BRG was paid $36,329.20 pursuant to the October Notice requests.  Fees and expenses requested in the November Notice were paid just after the close of the Reporting Period as follows: the Receiver was paid $3,099.96; Dorsey was paid $7,746.67, and BRG was paid $31,056.20.

The Receiver intends to file a *Fourth Interim Fee Application* for this Reporting Period shortly after the filing of this Status Report.  In that Fee Application, the Receiver will request allowance of fees and expenses included in the October Notice, the November Notice and

---

[26] Docket No. 111.

[27] Docket No. 112.

previously unrequested fees and expenses for December 2017, and seek authorization to pay the portions of allowed fees and expenses not paid to date.

VI.       **Conclusion**

The Receiver understands that making a distribution to those holding claims is of paramount importance.  She and her team are diligently working collectively to move this case to the next step which will involve seeking Court approval of procedures for those Traffic Monsoon investors who lost money to submit claims against the Receivership Estate.

Dated this 2nd day of March, 2018.

**RECEIVER**


*/s/ Peggy Hunt*
*Peggy Hunt, Receiver*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March, 2018, I caused the foregoing *Fourth Status Report (October 1, 2017 Through December 31, 2017)* to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of the filing to all counsel of record in this case.

*/s/ Candy Long*

4811-2433-4430\1

# EXHIBIT A

**STANDARDIZED FUND ACCOUNTING REPORT for Traffic Monsoon, LLC Receivership - Cash Basis**

Receivership; Civil Court Case No. 2:16-00832

REPORTING PERIOD  10/01/2017 TO 12/31/2017

| FUND ACCOUNTING (See Instructions): | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 10/01/17) | | | $48,732,159.94 |
| | *Increases in Fund Balance:* | | | |
| Line 2 | **Business Income** | | - | |
| Line 3 | **Cash and Securities** | $4,366,896.89 | $4,366,896.89 | |
| Line 4 | **Interest/Dividend Income** | $96,793.49 | $96,793.49 | |
| Line 5 | **Business Asset Liquidation** | | - | |
| Line 6 | **Personal Asset Liquidation** | | - | |
| Line 7 | **Third-Party Litigation** | - | | |
| Line 8 | **Miscellaneous - Other** | - | - | |
| | Total Funds Available (Lines 1-8): | | $4,463,690.38 | $53,195,850.32 |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | **Disbursements to Senior Secured Lenders/Investors** | - | - | |
| Line 10 | **Disbursements for Receivership Operations** | | $246,247.45 | |
| Line 10 | *Internal Loans* | - | | |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $246,147.45 | | |
| | 1. Fees: | | | |
| | Receiver | $34,629.88 | | |
| | Legal Advisers | $64,056.45 | | |
| | Accountants | $133,120.53 | | |
| | Consultants | $14,340.59 | | |
| Line 10b | *Business Asset Expenses* | - | | |
| Line 10c | *Personal Asset Expenses* | - | | |
| Line 10d | *Hospital Settlements & Investment Expenses* | - | | |
| Line 10e | *Third-Party Litigation Expenses* | - | | |
| | 1. Attorney Fees | - | | |
| | 2. Litigation Expenses | - | | |
| | *Total Third-party Litigation Expenses* | | - | |
| Line 10f | *Tax Administrator Fees and Bonds* | - | | |
| Line 10g | *Federal and State Tax Payments* | $100.00 | | |
| | Total Disbursements for Receivership Operations | | $246,247.45 | $246,247.45 |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | - | - | |
| Line 11 | *Distribution Plan Development Expenses* | - | | |
| Line 11a | *Distribution Plan Development Expenses:* | - | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | Independent Distribution Consultant (IDC) | - | | |
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses* | | - | |
| Line 11b | *Distribution Plan Implementation Expenses:* | | | |
| | 1. Fees: | - | | |
| | Fund Administrator | - | | |
| | IDC | - | | |

| | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | Receiver | - | | |
| | Legal Advisers | - | | |
| | Accountants | - | | |
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Investor Identification: | - | | |
| |    Notice/Publishing Approved Plan | - | | |
| |    Claimant Identification | - | | |
| |    Claims Processing | - | | |
| |    Web Site Maintenance/Call Center | - | | |
| | 4. Fund Administrator Bond | - | | |
| | 5. Miscellaneous | - | | |
| | 6. Federal Account for Investor Restitution (FAIR) Reporting Expenses | - | | |
| | *Total Plan Implementation Expenses* | | - | |
| | **Total Disbursements for Distribution Expenses Paid by the Fund** | | - | - |
| Line 12 | **Disbursements to Court/Other:** | | - | |
| Line 12 | *Disbursements to Court* | - | | |
| Line 12a |   *Investment Expenses/Court Registry Investment System (CRIS) Fees* | - | | |
| Line 12b |   *Federal Tax Payments* | - | | |
| | **Total Disbursements to Court/Other:** | | - | |
| Line 13 | **Total Funds Disbursed (Lines 9-12):** | | | $246,247.45 |
| Line 13 | **Ending Balance (As of 12/31/17):** | | | $52,949,602.87 |
| Line 14 | **Ending Balance of Fund - Net Assets:** | | | |
| Line 14a | *Cash & Cash Equivalents* | | | $52,949,602.87 |
| Line 14b | *Investments* | | | |
| Line 14c | *Other Assets or Uncleared Funds* | | | - |
| | **Total Ending Balance of Fund - Net Assets** | | | $52,949,602.87 |

| OTHER SUPPLEMENTAL INFORMATION: | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 15 | ***Report of Items NOT To Be Paid by the Fund:*** **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | - | - | |
| Line 15 | *Disbursements for Plan Administration Expenses* | - | | |
| Line 15a | *Plan Development Expenses Not Paid by the Fund:* | - | | |
| | 1. Fees: | - | | |
| |    Fund Administrator | - | | |
| |    IDC | - | | |
| |    Receiver | - | | |
| |    Legal Advisers | - | | |
| |    Accountants | - | | |
| |    Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Approved Living Allowance | - | | |
| | 4. Miscellaneous | - | | |
| | *Total Plan Development Expenses Not Paid by the Fund* | | - | |
| Line 15b | *Plan Implementation Expenses Not Paid by the Fund:* | - | | |
| | 1. Fees: | - | | |
| |    Fund Administrator | - | | |
| |    IDC | - | | |
| |    Receiver | - | | |
| |    Legal Advisers | - | | |
| |    Accountants | - | | |

| | | | | |
|---|---|---|---|---|
| | Consultants | - | | |
| | 2. Administrative Expenses | - | | |
| | 3. Investor Identification: | - | | |
| |    Notice/Publishing Approved Plan | - | | |
| |    Claimant Identification | - | | |
| |    Claims Processing | - | | |
| |    Web Site Maintenance/Call Center | - | | |
| | 4. Fund Administrator Bond | - | | |
| | 5. Miscellaneous | - | | |
| | 6. FAIR Reporting Expenses | - | | |
| | *Total Plan Implementation Expenses Not Paid by the Fund* | | - | |
| Line 15c | *Tax Administrator Fees & Bonds Not Paid by the Fund* | - | | |
| | **Total Disbursements for Plan Administrative Expenses Not Paid by the fund** | | | - |
| Line 16 | **Disbursements to Court/Other Not Paid by the Fund:** | - | - | |
| Line 16a | *Investment Expenses/CRIS Fees* | - | | |
| Line 16b | *Federal Tax Payments* | - | | |
| | **Total Disbursements to Court/Other Not Paid by the Fund:** | | | - |
| Line 17 | **DC & State Tax Payments** | - | | |
| Line 18 | **No. of Claims:** | | | |
| Line 18a | *# of Claims Received This Reporting Period* | | | - |
| Line 18b | *# of Claims Received Since Inception of Fund* | | | - |
| Line 19 | **No. of Claimants / Investors:** | | | |
| Line 19a | *# of Claimants / Investors Paid This Reporting Period* | | | - |
| Line 19b | *# of Claimants / Investors Paid Since Inception of Fund* | | | - |

Receiver:

By: _____

(signature)

Mary Margaret Hunt

(printed name)

_____

Receiver

(title)

Date: 2-15-18